[No. S123722. Feb. 24, 2005.]

In re HOWARD N., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
HOWARD N., Defendant and Appellant.

118

COUNSEL

Linnea M. Johnson, under appointment by the Supreme Court, and Francia M. Welker, under appointment by the Court of Appeal, for Defendant and Appellant.

Margaret Roberts for Protection and Advocacy, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Lloyd G. Carter, Janet E. Neeley, Louis M. Vasquez and Kathleen A. McKenna, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BROWN, J.—Welfare and Institutions Code[1] section 1800 et seq. delineates procedures governing the extended detention of dangerous persons. In particular, it provides for the civil commitment of a person at the time he would otherwise be discharged by statute from a Youth Authority commitment. We consider whether this extended detention scheme violates due process because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling behavior.[2]

 We conclude the extended detention scheme should be interpreted to contain such a requirement in order to preserve its constitutionality. However, because the jury was not instructed on this requirement, and there was little evidence defendant's mental abnormality caused him serious difficulty controlling his dangerous behavior, we further conclude defendant is entitled to a new commitment proceeding. We therefore reverse the Court of Appeal's judgment, which reversed the trial court's judgment without remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Howard N. was committed to the Youth Authority after he molested a three-and-a-half-year-old boy. His confinement was set to expire

---

[1] All further undesignated statutory references are to this code.

[2] Neither party addresses the last prong of the issue as stated in the petition for review, i.e., whether section 1800 et seq. should require a finding that "the person's deficiency, disorder, or abnormality causes serious difficulty controlling behavior, *resulting in a well-founded risk of reoffense*." This opinion therefore does not address that issue.

on February 19, 2003, which was defendant's 21st birthday. Pursuant to section 1800, the Kern County District Attorney's Office filed a petition to extend defendant's confinement.

At trial, three female correctional officers testified regarding four incidents, between June and November 2002, in which defendant was observed masturbating in his room. On three of these occasions, defendant shut off the light in his room as soon as he noticed the officer observing him. On the other occasion, the incident lasted approximately two to three minutes, and there was no testimony regarding whether defendant indicated any awareness the officer was observing him.

Clinical Psychologist Deborah Leong was a counselor for defendant during his confinement. Defendant told her that during one incident described above, he was "having fantasies" that the female correctional officer "would come down from the tower and would get aggressive with him and that he would then get aggressive with her and pull her into his room and force her to have sex with him. . . . He also was fantasizing that she would eventually like it." "He also admitted he had similar fantasies about" one of the other female correctional officers who had observed him. He said "he began having rape fantasies when he was about 18 at another facility. . . . He said that he would use these fantasies to help calm his anger through fantasies of force and making her like it."

On January 29, 2003, during a sex offender group meeting led by Dr. Leong and Youth Correctional Counselor Williamson, defendant was confronted about a prior incident in which Ms. Williamson had told defendant to go to his room. "He took an aggressive stance. He told her F-U [*sic*] and some other things, gave her the finger. And he began masturbating that finger with his other hand. [Ms. Williamson] told him that she felt quite intimidated and kind of threatened to be standing near him at the time."

With respect to his outbursts of anger, defendant "expressed some concern about his outbursts and his ability to control it. He felt that it could bring him back to jail." Defendant told Dr. Leong at one point he became "so angry at staff for not coming to speak with him that he began hitting his arm against the wall and he broke his arm." He also told Dr. Leong he had previously choked another child and banged the child's head until he was pulled off. Apparently as a result, he said he was placed in a psychiatric institution. "He also talked about other instances of firing up his anger . . . and being violent . . . [and] about enjoying being angry and rageful."

Near defendant's release date, a book and a poster, neither of which was made available at trial, were found in his room. Defendant was given the

book, entitled Forcible Rape, by staff, and it was apparently a staff library or office book intended for training purposes for the youth correctional counselors. The poster was of a clothed woman standing above two men. The men did not have shirts on and were tied together. Dr. Leong opined, "It definitely had features of sadomasochism."

Clinical Psychologist Deborah Morris conducted a psychological evaluation of defendant in November 2002. She reviewed his records, and in addition to a number of the incidents above recounted that on November 17, 2001, defendant had "been documented for choking another ward on the unit." On May 11, 2001, he "received a behavior report for leering at a female staff" member.

Dr. Morris also performed certain psychological tests. Consistent with earlier evaluations, defendant was in an elevated range "in the areas of anxiety and dependent personality disorder." He also "scored an elevated range on . . . the scale that measures antisocial personality traits." He scored high on the psychosocial sex inventory, "indicating that he generally denies having . . . deviant sex interests." Defendant also tends to see "other people as being against him and feels that he is the victim in most circumstances."

Defendant "scored in the positive direction on two items on the sadomasochistic scale." "[H]e answered positive to the first statement I've used leather whips and handcuffs or sharp things during sexual encounters and the second was there had been quite a few times I daydream about how pleasurable it would be to hurt someone during a sexual encounter." On the "psychopathy checklist," defendant scored 25. "A score of 30 is indicative of a psychopath," and "an average score for an adult male prisoner is 23."

Dr. Morris discussed defendant's committing offense with him, and found significant his description of walking into the room where the three-year-old boy was sleeping, spanking the child, and " 'wanting to wipe the look of innocence off his face.' " "It relates to his behavior [in 2002] because he's demonstrating a pattern of . . . sadistic qualities and traits in his behavior and his expressions of having thoughts . . . and fantasies of raping female staff at the youth authority."

Dr. Morris observed that in June 2002, a prior section 1800 evaluation of defendant had been performed by Dr. Minkowski. "[I]n that evaluation he expressed strong concerns about [defendant's] level of dangerousness," noting defendant "tended to pair anger and sexuality in a perverse fusion," and "had elements of hostility and sadism. However, at that time he felt there was a problem with documenting dangerousness because . . . [defendant] hadn't been acting out in a sexual way. This was right before we saw the incidents of the masturbation and the fantasies."

Dr. Morris diagnosed defendant with "Paraphilia Not Otherwise Specified," which she stated was an abnormal mental condition for a person to have. She explained, "That diagnosis is given when the pattern of behavior doesn't fit into a specific category that's already established." Thus, while defendant could be diagnosed as having pedophilia because he molested a toddler, "I felt that wasn't a very accurate or descriptive diagnosis because the pattern that is consistent throughout time is not only specific to children. It . . . has more of a sadistic quality to it. And so it would be more—more characterized by the diagnosis of sadism, which I also did not give him because . . . these traits and qualities are emerging right now, and I wanted to be conservative in my diagnosis." Dr. Morris observed, "I gave him that diagnosis because he did fit in a couple of different areas, pedophilia and sexual sadism; however, it's a very serious thing to diagnose somebody with sexual sadism." Dr. Morris responded affirmatively when asked whether "a person could progress to a point where they could stop their behavior." She noted that while defendant was "disclosing a lot of very disturbing things . . . this may be the first step in his treatment . . . and that he could possibly, therefore, benefit from further treatment" provided by the Youth Authority.

Dr. Morris drew a connection between her diagnosis and defendant's physical dangerousness. "[B]ecause he continued to act out in a sexual way on the unit, victimizing the female officers, . . . he still posed a physical danger[] to the community." Dr. Morris opined that "his recent behaviors of exposing himself along with the self-report of violent rape fantasies suggest[] that [defendant], due to an untreated sexual disorder, continues to present an imminent danger to his community."

The jury found defendant was "physically dangerous to the public because of a mental or physical deficiency, disorder or abnormality." The Court of Appeal reversed without remanding for a new commitment hearing, concluding the extended detention scheme was unconstitutional. It held that while the scheme required the jury to find "that the potential committee must have a mental deficiency, disorder, or abnormality that renders the person dangerous," it violated due process by not also requiring the jury to "determine whether the mental illness or abnormality causes the potential committee to have serious difficulty controlling his or her behavior and whether this loss of control results in a serious and well-founded risk of reoffense." The court further concluded the error was not harmless in this case because the jury "was not provided with the necessary information to impose a valid civil commitment." Because the court reversed on due process grounds, it did not reach defendant's equal protection claim.

We granted the Attorney General's petition for review.

## II. DISCUSSION

### A. Background

#### 1. Relevant Statutory Provisions

■ Enacted in 1963, the extended detention scheme in section 1800 et seq. provides for the civil commitment of individuals under the control of the Youth Authority. We have observed that the scheme involves neither a juvenile proceeding nor an extension of a prior juvenile court proceeding. (*In re Gary W.* (1971) 5 Cal.3d 296, 305 [96 Cal.Rptr. 1, 486 P.2d 1201] (*Gary W.*).) As relevant here, if the Department of the Youth Authority determines that discharge of a person from the control of the department at the time otherwise required by other statutes "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality," the department shall request that a petition be filed seeking continued commitment of the person. (§ 1800.)[3] The "petition shall be accompanied by a written statement of the facts upon which the department bases its opinion that discharge from control of the department at the time stated would be physically dangerous to the public."[4] (§ 1800.)

■ If the court determines that the petition on its face supports a finding of probable cause, the court orders a probable cause hearing. (§ 1801.) At this hearing, the court determines whether there is "probable cause to believe that discharge of the person would be physically dangerous to the public because of his or her mental or physical deficiency, disorder, or abnormality." (*Id.*, subd. (b).) If probable cause is found, the person is entitled to a jury trial. (§§ 1801, subd. (b), 1801.5.) At trial, the jury or other trier of fact is required to answer the following statutory question: "Is the person physically dangerous to the public because of his or her mental or physical deficiency, disorder, or abnormality?"[5] (§ 1801.5.) The person is entitled to "all rights guaranteed under the federal and state constitutions in criminal proceedings." (*Ibid.*) A reasonable doubt standard of proof applies, and any jury verdict must be unanimous. (*Ibid.*)

■ If the trier of fact finds the defendant satisfies the statutory criteria, he may be committed for up to two years. (§ 1802.) Following the same

---

[3] Sections 1800 and 1802 were amended in 2003. The changes do not affect our analysis of the issue here, and we therefore refer to these statutes in their current language.

[4] In 2003, the Legislature added section 1800.5, which provides for circumstances in which "the department has not made a request to the prosecuting attorney pursuant to Section 1800" and the Youth Authority Board "finds that the ward would be physically dangerous to the public because of the ward's mental or physical deficiency, disorder, or abnormality."

[5] There has been no allegation or evidence in this case defendant suffers from a "physical," as opposed to a "mental," "deficiency, disorder, or abnormality," and we therefore do not discuss further this aspect of the statutory scheme.

procedures outlined above, the defendant may be recommitted for such two-year periods indefinitely. (*Ibid.*) "These applications may be repeated at intervals as often as in the opinion of the authority may be necessary for the protection of the public, except that the department shall have the power, in order to protect other persons in the custody of the department to transfer the custody of any person over 21 years of age to the Director of Corrections for placement in the appropriate institution." (*Ibid.*)

■ In 1995, California enacted a civil commitment scheme for adults "immediately upon their release from prison" entitled the Sexually Violent Predators Act (SVPA). (§ 6600 et seq.; Stats. 1995, ch. 763, § 3, p. 4611; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1142, 1144 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).) An offender is subject to commitment if certain conditions are met, including that the person has a "diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A " '[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

■ In addition, the mentally disordered offender law (MDO) is a civil commitment scheme that applies to certain offenders during or after parole. (Pen. Code, § 2960 et seq.; *In re Qawi* (2004) 32 Cal.4th 1, 23 [7 Cal.Rptr.3d 780, 81 P.3d 224].) An offender is subject to commitment under the MDO if certain conditions are met. One condition is that the offender has a "severe mental disorder that is not in remission or cannot be kept in remission without treatment." (Pen. Code, § 2962, subd. (a).) " '[S]evere mental disorder' " is defined as "an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or which grossly impairs behavior; or that demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely. ¶ The term 'severe mental disorder' . . . does not include a personality or adjustment disorder, epilepsy, mental retardation or other developmental disabilities, or addiction to or abuse of intoxicating substances." (*Ibid.*)

## 2. *Due Process Requirements for Civil Commitment*

■ The high court has repeatedly "recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (*Addington v. Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804].) "Moreover, it is indisputable that involuntary

commitment to a [psychiatric] hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual." (*Id.* at pp. 425–426.)

■ Nevertheless, "[s]tates have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 357 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*).) The high court has "consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. [Citations.] It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." (*Ibid.*)

■ A recent series of cases both in the United State Supreme Court and in this court has clarified that to be involuntarily civilly committed as a sexually violent predator, the person must, as a result of mental illness, have serious difficulty controlling his dangerous behavior. (*Kansas v. Crane* (2002) 534 U.S. 407, 412–413 [151 L.Ed.2d 856, 122 S.Ct. 867] (*Crane*); *Hendricks, supra,* 521 U.S. at pp. 358, 360; *People v. Williams* (2003) 31 Cal.4th 757, 759, 772, 774 [3 Cal.Rptr.3d 684, 74 P.3d 779] (*Williams*); *Hubbart, supra,* 19 Cal.4th at pp. 1156, 1158.) Thus, in *Hendricks*, the high court stated, "A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' See, e.g., *Heller* [*v. Doe* (1993) 509 U.S. 312, 314–315 [125 L.Ed.2d 257 113 S.Ct. 2637]] (Kentucky statute permitting commitment of 'mentally retarded' or 'mentally ill' and dangerous individual); *Allen v. Illinois,* 478 U.S. 364, 366 [92 L.Ed.2d 296, 106 S.Ct. 2988] (1986) (Illinois statute permitting commitment of 'mentally ill' and dangerous individual); *Minnesota ex rel. Pearson v. Probate Court of Ramsey Cty.,* 309 U.S. 270, 271–272 [84 L.Ed. 744, 60 S.Ct. 523] (1940) (Minnesota statute permitting commitment of dangerous individual with 'psychopathic personality'). These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control. The Kansas Act is plainly of a kind

with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior. [Citation.] The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." (*Hendricks*, at p. 358.) "To the extent that the civil commitment statutes we have considered set forth criteria relating to an individual's inability to control his dangerousness, the Kansas Act sets forth comparable criteria and Hendricks' condition doubtless satisfies those criteria. . . . [His] admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." (*Id.* at p. 360.)

In *Crane, supra*, 534 U.S. 407, the high court revisited the Kansas Act, noting that *Hendricks* did not set forth any requirement of total or complete lack of control. (*Id.* at p. 411.) The court also noted, "We do not agree with the State, however, insofar as it seeks to claim that the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination. [Citation.] *Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' [Citation.] That distinction is necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment. [Citations.] The presence of what the 'psychiatric profession itself classified . . . as a serious mental disorder' helped to make that distinction in *Hendricks*. And a critical distinguishing feature of that 'serious . . . disorder' there consisted of a special and serious lack of ability to control behavior. [¶] In recognizing that fact, we did not give to the phrase 'lack of control' a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Crane, supra*, 534 U.S. at pp. 412–413.)

■ In *Hubbart, supra,* 19 Cal.4th 1138, we relied on *Hendricks* extensively in rejecting the defendant's constitutional challenges to the California SVPA. As relevant here, we stated, "Much like the Kansas law at issue in *Hendricks,* our statute defines an SVP as a person who has committed sexually violent crimes and who currently suffers from 'a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' (§ 6600, subd. (a).) Through this language, the SVPA plainly requires a finding of dangerousness. The statute then 'links that finding' to a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior. [Citation.] This formula permissibly circumscribes the class of persons eligible for commitment under the Act." (*Hubbart,* at p. 1158, fn. omitted; see *ibid.* ["due process *requires* an inability to control dangerous conduct"].)

■ We again addressed the California SVPA in *Williams, supra,* 31 Cal.4th 757, which was decided after *Crane.* While the SVPA did not use *Crane's* "precise language in defining who is eligible for involuntary civil commitment as a sexually violent predator," i.e., " 'proof [that they have] serious difficulty in controlling [their dangerous] behavior,' " we nonetheless concluded the SVPA "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior." (*Williams,* at p. 759.) In so doing, we observed that to be committed as a sexually violent predator under the SVPA, one must, among other things, have a " 'diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' (§ 6600, subd. (a)(1).) A ' "[d]iagnosed mental disorder" includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.' (*Id.,* subd. (c).)" (*Williams,* at p. 764.) Based on this language, we concluded that "a jury instructed in the language of [the SVPA] must necessarily understand the need for serious difficulty in controlling behavior." (*Williams,* at p. 774; see *id.* at p. 776.) "The SVPA's plain words . . . '. . . distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.' [Citation.]" (*Williams,* at pp. 759–760.) "Accordingly, separate instructions or findings on that issue are not constitutionally required, and no error arose from the court's failure to give such instructions in defendant's trial." (*Id.* at p. 777, fn. omitted.)

B. *Analysis*

We now consider whether the extended detention scheme violates due process because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling his dangerous behavior. As can be seen, the statutory scheme involved in *Hendricks* and *Crane* addressed sexually violent predators, persons who suffer from an ailment that typically contains a compulsive element. However, nothing in the language of these high court cases indicates that the lack of control requirement is limited to the sexually violent predator context. Indeed, it is difficult to imagine on what basis the high court could articulate different due process standards for the civil commitment of dangerous mentally ill persons who happen to be sexually violent predators than for those dangerous mentally ill persons who are not sexually violent predators. Thus, while the high court performed its due process analysis in the sexually violent predator context, its constitutional pronouncements are instructive here.

Indeed, in both *Williams* and *Hubbart*, we described *Hendricks* and *Crane* as embodying general due process principles regarding civil commitment. (*Williams*, *supra*, 31 Cal.4th at p. 759 [in *Crane*, "the United States Supreme Court held that the safeguards of personal liberty embodied in the due process guaranty of the federal Constitution prohibit the involuntary confinement of persons on the basis that they are dangerously disordered without 'proof [that they have] serious difficulty in controlling [their dangerous] behavior' "]; *id.* at p. 772 [in *Crane* and *Hendricks*, the high court indicated that "if individuals could be civilly confined as dangerous without *any* disorder-related difficulty in controlling their dangerous behavior, there would be no adequate distinction from the general run of dangerous persons who are subject exclusively to the criminal law"]; *id.* at p. 774 [*Crane*'s language intended to "verify that a constitutional civil confinement scheme cannot *dispense* with impaired behavioral control as a basis for commitment"]; *Hubbart*, *supra*, 19 Cal.4th at p. 1156 ["According to *Hendricks*, civil commitment is permissible as long as the triggering condition consists of 'a volitional impairment rendering [the person] dangerous beyond their control' "]; *id.* at p. 1158 ["due process *requires* an inability to control dangerous conduct"]; *id.* at p. 1161 [*Foucha v. Louisiana* (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780] "is not inconsistent with the general due process principles set forth in *Hendricks*"]; see *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 920 [119 Cal.Rptr.2d 1, 44 P.3d 949] ["The SVPA thus consistently emphasizes the themes common to valid civil commitment statutes, i.e., a current *mental condition or disorder* that makes it difficult or impossible to control volitional behavior and *predisposes* the

person to inflict harm on himself or others, thus producing *dangerousness* measured by a high risk or threat of further injurious acts if the person is not confined"].)

The high court's pronouncements are particularly pertinent in this case. Here, defendant was diagnosed with a mental abnormality, paraphilia not otherwise specified, that was described as a sexual disorder, and which was based on his demonstration of elements of pedophilia and sexual sadism. Dr. Morris's opinion regarding defendant's dangerousness was based on this diagnosed disorder. Thus, while this is not a sexually violent predator case, there would seem little analytical basis under these circumstances to stray from the due process requirements the high court has established for the civil commitment of sexually violent predators. Moreover, the Attorney General here concedes that to be constitutional, the extended detention scheme must contain a requirement of serious difficulty in controlling dangerous behavior, in order to distinguish those persons who are subject to civil commitment from those persons more properly dealt with by the criminal law. We therefore conclude such a requirement is constitutionally mandated.

 We further conclude that the extended detention scheme should be interpreted to contain a requirement of serious difficulty in controlling dangerous behavior. In so doing, we are mindful that if "feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 175 [167 Cal.Rptr. 854, 616 P.2d 836] (*Hofferber*); see generally *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 615, 641–661 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (lead opn. of Lucas, C. J.).)

As noted above, the high court has observed that historically it has "sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' [Citations.] These added statutory require-ments serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." (*Hendricks, supra,* 521 U.S. at p. 358.)

 Similarly, here, the extended detention scheme requires a finding that the person is "physically dangerous to the public" because of a "men-tal . . . deficiency, disorder, or abnormality." (§ 1801.5.) While the statutory language does not expressly require a demonstration that the person has serious difficulty controlling his dangerous behavior, construing the existing language to include such a requirement does not appear inconsistent with legislative intent. Rather, implicit in the statutory language linking dangerous-ness to a "mental . . . deficiency, disorder, or abnormality" is a certain

legislative understanding that a person afflicted with such a condition may lack a degree of responsibility or control over his actions. In construing the language to include a requirement of serious difficulty in controlling dangerous behavior, we therefore do no violence to the words of the statute; rather the words are susceptible of that interpretation. In that situation, construing the statutory scheme to avoid constitutional infirmity demonstrates greater deference to the Legislature than simply invalidating, as the Court of Appeal did, the legislative scheme.

Moreover, the Legislature has made it clear over the history of the extended detention scheme that it is committed to making the scheme constitutional. Thus, in two cases decided on the same day, *People v. Smith* (1971) 5 Cal.3d 313, 317–319 [96 Cal.Rptr. 13, 486 P.2d 1213] and *Gary W.*, *supra*, 5 Cal.3d at page 307, we held that a person subject to commitment under the extended detention scheme was constitutionally entitled to a jury trial, and could not be civilly detained longer if he were committed after criminal conviction than if by the juvenile court. Both cases were remanded to the superior court for new commitment hearings. (*Smith*, at pp. 317, 319; *Gary W.*, at pp. 308–309, 312.) In response to these two decisions, the Legislature amended the extended detention scheme to expressly provide for a jury trial and a two-year commitment limitation for all persons. (See Dept. of Youth Authority, Enrolled Bill Rep. on Assem. Bill No. 1845 (1971 Reg. Sess.) Nov. 22, 1971, p. 1 ["The California Supreme Court, in the Harry Coley Smith case, . . . and in the Gary W. case, . . . held that a person who has been declared a dangerous person under [the extended detention scheme] is entitled to a jury trial to conform with due process. . . . This bill merely enacts the provisions as dictated by the court"]; Assem. Com. on Ways and Means, Analysis of Sen. Bill No. 1877 (1979–1980 Reg. Sess.) as amended July 2, 1980, pp. 1–2 ["reduces from 5 to 2 years the length of time the Youthful Offender Parole Board can request continued detention of a ward committed from criminal court. [¶] . . . [¶] . . . [T]here would be no fiscal impact on the Youth Authority because the reduction in law on extended commitments simply reflects existing practice"]; Dept. of Youth Authority, Enrolled Bill Rep. on Sen. Bill No. 1877 (1979–1980 Reg. Sess.) Sept. 8, 1980, p. 2 ["There is a problem with [the] current statute which is misleading to judges, district attorneys, defense lawyers and the public. Section 1802 W&IC currently indicates that a person committed to the Youth Authority from the criminal court may have his jurisdiction extended by five years if he is found to be a dangerous person . . . . Case law, *People v Smith* (1971) 5 C.3d 313 [96 Cal.Rptr. 13, 486 P.2d 1213], limits the extension of jurisdiction to two years. [¶] . . . [T]he bill would amend § 1802 W&IC to reduce the extended detention of dangerous . . . wards committed by adult courts from five to two years and conforms [the] statute to case law"].)

Likewise, in *People v. Superior Court (Vernal D.)* (1983) 142 Cal.App.3d 29, 35–36 [190 Cal.Rptr. 721], the Court of Appeal held that the extended detention scheme was unconstitutional to the extent it authorized a commitment based on less than a unanimous jury verdict. For the guidance of the trial court on remand, the Court of Appeal also concluded that the reasonable doubt standard of proof applied. (*Id.* at p. 36, fn. 3.) While the trial court had dismissed the petition for extended commitment, the Court of Appeal concluded dismissal was erroneous, and that instead Vernal D. was entitled to a jury trial on the dangerousness issue. (*Id.* at p. 31.) The court further held that "his dangerousness must be established by proof beyond a reasonable doubt; and he may not be involuntarily committed on anything less than a unanimous verdict of that jury." (*Id.* at p. 37.) The Legislature promptly responded by amending the extended detention scheme to provide for proof beyond a reasonable doubt and a unanimous verdict. (Assem. Com. on Crim. Law and Public Safety, Analysis of Assem. Bill No. 2760 (1983–1984 Reg. Sess.) as introduced Feb. 7, 1984, p. 1 ["The purpose of the bill is to codify judicially mandated due process safeguards in the statute to insure that extension proceedings are conducted properly. (See *People v. Superior Court (supra)* 142 Cal.App.3d 29.) . . . This is a rather rare proceeding and it can't be assumed most prosecutors are familiar with it. Therefore, it is important to correct the statutes which currently inaccurately reflect what procedural safeguards are necessary"]; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2760 (1983–1984 Reg. Sess.) as introduced Feb. 7, 1984, pp. 1–2 ["The statute now requires that three-fourths of the members of the jury agree by a preponderance of evidence that the ward is dangerous. An appellate court decision, however, has held that due process and equal protection require a unanimous jury verdict beyond a reasonable doubt. [¶] This bill would codify these procedural requirements . . . . [¶] The purpose of this bill is to conform statutory and case law"]; see also Assemblyman Rusty Areias, letter to Governor Deukmejian re Assem. Bill No. 2760, July 9, 1984, p. 1 ["AB 2760 incorporates safeguards necessary to meet constitutional requirements, thereby preserving a procedure that is vital to protect the public from dangerous, mentally-unbalanced youthful offenders"].)

We employed a similar approach of construing a civil commitment statute to preserve its constitutionality in *Hofferber, supra,* 28 Cal.3d 161. In that case, we concluded that "the state may confine incompetent criminal defendants, *on grounds that they remain violently dangerous,* when a magistrate or grand jury has found probable cause to believe that they have committed violent felonies." (*Id.* at p. 174.) We observed, however, that the relevant statutes did "not expressly require a showing of continuing dangerousness," but appeared "to permit indefinite maintenance of [Lanterman-Petris-Short Act] conservatorships solely because the incompetence continues and the

violent felony charges have not been dismissed."[6] (*Hofferber*, at pp. 174–175.) Therefore, in order to preserve the constitutionality of the statutory scheme, we construed it to require current dangerousness. (*Id.* at pp. 175, 176–178.)

We noted, "Clearly the Legislature's focus on violent felony charges reflects a concern as to dangerousness in criminal incompetency cases . . . ." (*Hofferber, supra*, 28 Cal.3d at p. 175.) Moreover, while there were "several 'danger' definitions appearing in California statutes" regarding involuntary commitment, we concluded that "[t]he distinctions among those definitions appear more form than substance," and chose as most closely analogous the definition of danger found in the "criminal insanity provisions." (*Id.* at p. 176.) We therefore held "that every judgment creating or renewing a conservatorship for an incompetent criminal defendant . . . must reflect written findings that, by reason of a mental disease, defect, or disorder, the person represents a substantial danger of physical harm to others," and upheld the relevant statutory scheme as so construed. (*Id.* at pp. 176–177.) However, because Hofferber had apparently not had a hearing at which his current dangerousness was so demonstrated, we reversed the conservatorship order entered below. (*Id.* at p. 178.)

 Thus, as we have done before, we can preserve the constitutionality of the extended detention scheme by simply interpreting the scheme to require not only that a person is "physically dangerous to the public because of his or her mental . . . deficiency, disorder, or abnormality," but also that the mental deficiency, disorder, or abnormality causes him to have serious difficulty controlling his dangerous behavior. This aspect of the person's condition must be alleged in the petition for extended commitment (§ 1800), and demonstrated at the probable cause hearing (§ 1801) and any ensuing trial (§ 1801.5).

 In so doing, we do not impinge on a role properly reserved to the Legislature. We are cognizant of the fact that the definition of mental illness

---

[6] The Lanterman-Petris-Short (LPS) Act is a comprehensive civil commitment scheme "designed to address a variety of circumstances in which a member of the general population may need to be evaluated or treated for different lengths of time. (§ 5150 [short-term emergency evaluation]; § 5250 [intensive 14-day treatment]; § 5300 [180-day commitment for the imminently dangerous]; § 5260 [extended commitment for the suicidal]; § 5350 [30-day temporary conservatorship or one-year conservatorship for the gravely disabled].) . . . [¶] A stated purpose of the LPS Act is to provide 'prompt evaluation and treatment of persons [from the general population] with serious mental disorders.' (§ 5001, subd. (b).) . . . To achieve this purpose, a number of LPS Act provisions allow a person to be removed from the general population in order to be civilly committed based on a probable cause determination made by a mental health or law enforcement professional, and then to challenge the civil commitment within a reasonable time afterwards." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253–254 [127 Cal.Rptr.2d 177, 57 P.3d 654].)

warranting involuntary civil confinement is primarily a legislative task. (*Williams, supra,* 31 Cal.4th at p. 774 ["the premise of both *Hendricks, supra,* 521 U.S. 346, and *Kansas v. Crane, supra,* 534 U.S. 407, [is] that, in this nuanced area, the *Legislature* is the primary arbiter of how the necessary mental-disorder component of its civil commitment scheme shall be defined and described"].) For that reason, we have not found persuasive the Attorney General's argument we read into the extended detention scheme "definitions for a mental disorder found in analogous MDO and/or SVPA civil commitment schemes." (See *ante,* at p. 127.) Rather than define such conditions, which we are ill-equipped to do, we simply conclude that however the Legislature does or does not choose to define "mental . . . deficiency, disorder, or abnormality," due process principles require that the state demonstrate that the "mental . . . deficiency, disorder, or abnormality" causes the person to have serious difficulty controlling his dangerous behavior.

Defendant contends we are precluded from reading a volitional requirement into the statute, because in 1998 the Legislature amended the extended detention scheme to add a definition of mental illness similar to that in the SVPA, and then deleted this language before the bill was enacted. (Compare Sen. Amend. to Sen. Bill No. 2187 (1997–1998 Reg. Sess.) Apr. 13, 1998 [adding definition similar to the SVPA][7] with Sen. Amend. to Sen. Bill No. 2187 (1997–1998 Reg. Sess.) Apr. 28, 1998 [deleting definition].) One committee report noted that the proposed definition "appears to be . . . broader than the comparable statute applicable to adults," which the report identified as the MDO definition, "and arguably may overreach in its scope." (Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 2187 (1997–1998 Reg. Sess.) as amended Apr. 13, 1998, p. 8.)

The primary purpose of the 1998 amendment was not to define "mental deficiency, disorder, or abnormality," but to clarify that prosecutors were not required under the extended detention scheme to perform two trials with the standard of proof for both being beyond a reasonable doubt. (Sen. Subcom. on Juvenile Justice, Analysis of Sen. Bill No. 2187 (1997–1998 Reg. Sess.) as amended Apr. 13, 1998, pp. 3–5, 7; *id.* at p. 7 ["This bill largely would clarify the judicial proceedings associated with 1800 procedures. To the extent current case law can be interpreted to require both a court trial using a standard of proof beyond a reasonable doubt and then an additional jury trial with the same standard of proof, this bill would correct that problem. [¶] It also would set forth the initial probable cause hearing for the petition, and a

---

[7] The proposed definition provided: "As used in this section and in Section 1801.5, 'mental deficiency, disorder, or abnormality' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal acts in a degree constituting a danger to the health and safety of others." (Sen. Amend. to Sen. Bill No. 2187 (1997–1998 Reg. Sess.) Apr. 13, 1998.)

definition of 'mental deficiency, disorder, or abnormality' "].) Indeed, as can been seen, the definition of "mental deficiency, disorder, or abnormality" was a legislative topic for only a brief period during the bill's five-month legislative journey.

Nor can we know why the definition was added and then removed. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 572, fn. 5 [21 Cal.Rptr.3d 31, 21 Cal.Rptr.3d 331] [" 'Unpassed bills, as evidence[] of legislative intent, have little value' "].) There is some indication certain legislators may have preferred the MDO definition be used instead. However, it might also be that neither the SVPA nor the MDO standards (see *ante*, at p. 127), which derive from statutory schemes designed to target particular groups of individuals, readily work in the context of the more generally applicable extended detention scheme. Thus, the 1998 addition and then deletion of a definition of "mental deficiency, disorder, or abnormality" does not preclude us from construing the current extended detention scheme to include an impaired volitional capacity requirement. It simply means that while primarily addressing a completely different and unrelated issue, the Legislature rejected a definition based on the SVPA for unknown reasons.

We next consider whether, despite the absence of a jury instruction addressing the need for the People to demonstrate defendant's serious difficulty in controlling his dangerous behavior, the jury nevertheless necessarily made such a finding. (See *People v. Roberge* (2003) 29 Cal.4th 979, 989 [129 Cal.Rptr.2d 861, 62 P.3d 97] [trial court must instruct on the meaning of "likely" in definition of sexually violent predator "even without a request by any party"].) Here, defendant does not contend he does not suffer from a "mental . . . abnormality" within the meaning of the extended detention scheme. He merely contends that unlike *Williams*, on which the Attorney General relies, the evidence here was not such that "no rational jury could have failed to find [defendant] harbored a mental disorder that made it seriously difficult for him to control his violent . . . impulses . . . [making] the absence of a 'control' instruction . . . harmless beyond a reasonable doubt." (*Williams*, *supra*, 31 Cal.4th at p. 760.) We agree.

In *Williams*, the defendant had to be physically restrained from continuing the rape of one of his victims, even after the crime was interrupted by police. (*Williams*, *supra*, 31 Cal.4th at p. 760.) Two experts testified he suffered from a largely uncontrollable obsessive drive to rape. (*Id.* at pp. 761–762.) One expert contrasted this with "a rape committed as a crime of opportunity, as where a burglar enters a home to steal property, but by happenstance encounters a victim." (*Id.* at p. 761, fn. 2.) He also recounted the defendant's statement regarding his sexual pathology that he felt " ' "like a fish on a hook and I don't have control." ' " (*Id.* at p. 761.) The other expert noted the

defendant had " 'very poor control over his impulses.' " (*Id.* at p. 762.) Moreover, while incarcerated, the defendant "openly masturbated in the prison library and exposed himself in groups where females were present." (*Id.* at p. 761.) Based on this "essentially undisputed" evidence "that [the] defendant's diagnosed mental disorder involved serious difficulty in controlling sexual behavior," we concluded, "the absence of an instruction pinpointing that issue must 'beyond a reasonable doubt . . . have made no difference in reaching the verdict obtained.' " (*Id.* at p. 778.)

Here, Dr. Morris did testify that defendant was dangerous, i.e., that defendant's "recent behaviors of exposing himself along with the self-report of violent rape fantasies suggest[] that [defendant], due to an untreated sexual disorder, continues to present an imminent danger to his community." There was, however, no testimony that defendant's mental abnormality caused him serious difficulty controlling his sexually deviant behavior. Whereas in *Williams* there was expert testimony that paraphilia not otherwise specified, the mental abnormality with which defendant was diagnosed, was "a mental disorder characterized by intense and recurrent fantasies, urges, and behaviors about sex with nonconsenting persons, which symptoms persist for six months or more and cause significant dysfunction or personal distress," no such information was relayed to the jury here. (*Williams*, *supra*, 31 Cal.4th at p. 761.) Moreover, defendant's committing offense, unlike those in *Williams*, was one of opportunity; his mother was babysitting the sleeping victim. (See *Williams*, at p. 761, fn. 2.) In addition, his incidents of masturbation occurred in his room, not in a public setting such as a library, as in *Williams*. Although defendant undoubtedly intended his behavior to be provocative and disturbing, he discontinued visibly masturbating as soon as he was sure the female officers observed him. Thus, the evidence was not such that "no rational jury could have failed to find [defendant] harbored a mental disorder that made it seriously difficult for him to control his violent . . . impulses . . . [making] the absence of a 'control' instruction . . . harmless beyond a reasonable doubt." (*Williams*, at p. 760.) We therefore conclude that to the extent defendant does not prevail on any remaining claims in the Court of Appeal on remand, he is entitled to a new petition, probable cause hearing, and if necessary, trial, under the correct due process standard.[8]

---

[8] Defendant also contends the extended detention scheme is in fact a penal, not a civil, commitment scheme, and hence "its constitutionality should not be judged by the constitutional standards applied to civil commitments but by more rigorous standards of substantive due process." He further contends the extended detention scheme violates equal protection. Defendant did not raise these issues in an answer to the petition for review. Hence they are not before us. (Cal. Rules of Court, rule 29.1(b)(2), (3).)

## III. Disposition

The judgment of the Court of Appeal is reversed, and the case remanded to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.