[No. C049214. Third Dist. Aug. 15, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ABRAHAM GALINDO, Defendant and Appellant.

## COUNSEL

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson and Mary Jo Graves, Assistant Attorneys General, Julie A. Hokans and Jeanne Wolfe, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—In February 2004, a petition for extended commitment under Penal Code[1] section 1026.5 was filed alleging that defendant Abraham Galindo had been committed under the provisions of section 1026 for the felony of possession of a firearm by a convicted felon (§ 12021, subd. (a)), with a strike allegation (§ 667, subds. (d), (e)) and a prior prison term allegation (§ 667.5, subd. (b)). The petition alleged that defendant's commitment, which was scheduled to end on August 31, 2004, should be extended to August 31, 2006.

Jury trial was waived and a court trial was held in February 2005. Defendant's commitment was extended to August 31, 2006.

Defendant contends, and the Attorney General concedes, that following the recent case of *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), section 1026.5, subdivision (b)(1), must be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior. The parties disagree as to whether the trial court's failure to consider this "control" issue was prejudicial. Defendant has the better argument, and we shall reverse the judgment.

### FACTS

*Prosecution case-in-chief*

Defendant is committed to Napa State Hospital (NSH). His diagnosis is bipolar 1 disorder, and his last bipolar episode was presumed to be manic. He is taking lithium citrate, which is a mood stabilizing medication. However, he angrily denies suffering from a bipolar disorder and needing treatment or medication. He also has shown "a lot" of ambivalence about taking medication should he be released. Dr. Sutherland, one of defendant's psychiatrists, opined that if defendant is released he will immediately stop taking the medication.

---

[1] Undesignated statutory references are to the Penal Code.

Defendant also has an antisocial personality disorder, which allows a person to maintain a criminal lifestyle for a long period of time. Treatment for antisocial personality disorder is difficult because it is a "very durable characteristic," and defendant's willingness to participate in treatment is "very limited." He angrily denies having a personality disorder: he stands up, yells, shakes his finger, and raises his voice.

In addition, defendant has polysubstance dependence. However, he denies that he has abused substances, despite a number of "DUI's" on his record and a history of drug abuse problems that are "fairly well documented." In 1984, he was convicted of possessing marijuana for sale and selling marijuana; and in 1988, he was convicted of possessing cocaine, cultivating marijuana, and selling methamphetamine. He is in "institutional remission," which means he can go without drugs and substances as long as he is in a highly structured environment.

Defendant does not accept his history of criminality, which includes convictions in 1976 of first degree burglary and forcible rape. Instead, he claims that various agencies and criminal elements have framed him and set him up. Regarding the offense that resulted in his commitment (possession of a firearm by a convicted felon), defendant claimed he was attempting suicide, he shot his wife accidentally, and the police filed a false report.

The Hare Psychopathy Checklist has "one of the bigger correlations with future dangerousness." Defendant was given the checklist instrument twice, and his scores are a "strong predictor of future violence."

"CONREP"[2] is the standard supervision program that patients use upon their release from NSH. Defendant does not want to work with CONREP. Dr. Monks, a psychiatrist who works with defendant in group therapy, opined that in an unstructured environment defendant will return to his unlawful activities.

In a recent incident at NSH, defendant pursued a "very fragile psychotic patient." He was told to stop, but he continued pursuing her. As a result, he was transferred to another unit.

---

[2] The Forensic Conditional Release Program, part of the Department of Mental Health's statewide system of community-based services for specified forensic patients. (<//http://www.dmh.ca.gov.forensic/conrep.asp> [as of Aug. 15, 2006].)

Dr. Sutherland opined that defendant represents a substantial danger of physical harm to others if he is released from the hospital. Dr. Monks was also of that view.

An exhibit to the extended commitment petition included an affidavit from the NSH medical director opining that defendant qualifies for an extension of his commitment because, by reason of a mental disease, defect or disorder, he represents a substantial danger of physical harm to others.

The petition exhibit also included a December 15, 2003, recommendation for extension of commitment. This document includes the following information: Defendant was admitted to NSH in April 1999 from Patton State Hospital, where he had resided since June 1997. Defendant's criminal history began at age 10, when he owned a gun, began selling drugs, was a gang member, and stabbed his paternal grandfather. Defendant has had numerous alcohol-related arrests, "although he consistently denies ever having a substance abuse problem." He has been prosecuted for rape, burglary, battery, sale of controlled substances, and parole violations. Defendant is 54 years old and his psychiatric history dates from his early twenties. His suicide attempts include cutting his wrists as an adolescent, attempting a drug overdose in 1978, shooting himself in 1983 and 1988, and attempting to hang himself in 1996. Defendant has shown "little change over the past twelve months." He minimizes the present offense and denies that he has a mental illness. He is convinced that he can return to the community without CONREP supervision. He is quoted as saying: " 'I don't need supervision. I don't have mental illness. Ask anybody,' and 'I don't need meds. This is just the way I am. My personality' and 'When are you gonna take me off medications? I was just fine when they put me on it.' He still feels that he was 'set up' by the Mexican Mafia, and the police lied on the reports in order to place him here. 'I'm here illegally.' "

The recommendation states that defendant continues to demonstrate "manic behaviors like being loud, hyperverbal, and difficult to interrupt." He is "subsequently [sic, consequently] unable to effectively communicate with his peers and staff." He is resistive to unit rules and policies. He is intrusive in groups and unable to benefit fully from them as a result. Because of present medication, he has maintained adequate behavior for the past several months. However, he "has no insight" into the role that his medication plays in his behavioral control. Defendant is "at high risk for re-offending based on the fact that he has minimal insight into his mental illness and behaviors" and "has shown no progress while being in the hospital . . . ." "He will, more

likely than not, discontinue his medications upon release and decompensate." The treatment team opined that, because of a mental defect or disorder, defendant represents a substantial danger of physical harm to others.

*Defense*

Dr. French, a psychiatrist, evaluated defendant for the defense and concluded that he has been restored to sanity.

Dr. French agreed with the diagnosis of bipolar 1 disorder, polysubstance dependence in institutional remission, and personality disorder. If defendant were released to the community, several steps would have to be taken to reduce his dangerousness to an acceptable level. Oversight by CONREP would be required. Dr. French had no disagreement with defendant's score on the Hare Psychopathy Test.

If defendant is released, he will live with his mother. His sister and niece will help care for him. His sister will take him to a private counselor and to NA (Narcotics Anonymous) and AA (Alcoholics Anonymous) meetings.

## DISCUSSION

Defendant contends, and the Attorney General concedes, that following *Howard N., supra,* 35 Cal.4th 117, section 1026.5, subdivision (b)(1), must be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior. We accept the Attorney General's concession.

Section 1026.5, subdivision (a)(1), requires the trial court to state in its commitment order the maximum term of commitment for any person committed to a state hospital pursuant to section 1026 (plea of insanity joined with other pleas). Section 1026.5, subdivision (b)(1), provides: "A person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others."

Like section 1026.5, Welfare and Institutions Code section 1800 et seq. provides a mechanism for the extended detention of dangerous persons. Specifically, it provides for the civil commitment of a person at the time he or

she would otherwise be discharged from a Youth Authority commitment. *Howard N., supra,* 35 Cal.4th 117, considered whether this extended detention scheme violates due process because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling behavior. *(Id.* at p. 122.)

After analyzing federal and state decisional law concerning other civil commitment schemes, such as those involving sexually violent predators and incompetent criminal defendants, *Howard N., supra,* 35 Cal.4th 117, held that, in order to preserve the constitutionality of Welfare and Institutions Code section 1800 et seq., the "extended detention scheme should be interpreted to contain a requirement of serious difficulty in controlling dangerous behavior." *(Howard N., supra,* 35 Cal.4th at p. 132.) This added requirement serves "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous *beyond their control." (Id.* at p. 128, italics added.) Quoting *Kansas v. Hendricks* (1997) 521 U.S. 346, 360 [138 L.Ed.2d 501, 117 S.Ct. 2072], *Howard N.* explained that a prediction of future dangerousness, coupled with evidence of lack of volitional control, adequately distinguishes between persons who are subject to civil commitment and " 'other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' " *(Howard N., supra,* 35 Cal.4th at p. 129, quoting *Hendricks,* at p. 360.)

■ The Attorney General concedes that, given the similarity between section 1026.5 and Welfare and Institutions Code section 1800 et seq., section 1026.5, subdivision (b)(1), should be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior. (Citing *People v. Watkins* (1996) 45 Cal.App.4th 485, 490 [53 Cal.Rptr.2d 13] [interpretation of ambiguous statutory phrase may be aided by reference to other statutes that apply to similar or analogous subjects].) We accept the Attorney General's concession.[3]

The Attorney General nevertheless claims defendant has forfeited his contention by failing to object to the trial court's extension order on due process grounds. The Attorney General reasons that the authorities cited in *Howard N., supra,* 35 Cal.4th 117, gave defendant a legal basis for a due process objection, even though *Howard N.* was not decided until two days after the extension order was issued.

---

[3] The Attorney General made a similar concession in *Howard N., supra,* 35 Cal.4th at page 132.

■ However, the process that *Howard N., supra*, 35 Cal.4th 117, held was due is the adduction of *proof of a fact*, "serious difficulty controlling . . . dangerous behavior," without which the evidence supporting the commitment necessarily would be insufficient. (*Id.* at p. 128.) A challenge to the sufficiency of evidence is forfeited in the trial court only by failure to file timely notice of appeal. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262 [70 Cal.Rptr.2d 334, 949 P.2d 31].) Even if we deemed defendant's due process claim forfeited, we would need to consider his related claim that "there was little evidence defendant's mental abnormality caused him serious difficulty controlling his dangerous behavior." (*Howard N., supra*, 35 Cal.4th at p. 122.) In the interest of judicial economy, we consider his *Howard N.* argument on its merits.

In *Howard N., supra*, 35 Cal.4th 117, the evidence was not such that any rational jury would have found that the " '[defendant] harbored a mental disorder that made it seriously difficult for him to control his violent . . . impulses . . . [making] the absence of a "control" instruction . . . harmless beyond a reasonable doubt.' [Citation.]" (*Id.* at p. 138.) Thus, unless he prevailed on other remanded claims, the defendant was entitled to a new petition and adjudication under the correct due process standard. (*Ibid.*; see *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

The Attorney General claims the trial court's failure to consider the "control" issue was harmless beyond a reasonable doubt. In the Attorney General's view, "overwhelming evidence supports a finding that [defendant] has serious difficulty controlling his dangerous behavior. His criminal history, which began at age 10, shows that he cannot stop his criminal behavior or substance abuse unless he is in a controlled environment like NSH. Even in NSH, he experiences manic behaviors like being loud, hyperverbal, and difficult to interrupt. He also angrily denies having a personality disorder: He stands up, yells, shakes his finger, and raises his voice. Additionally, he was unable to stop pursuing another patient even when routinely told to do so. Further, his scores on the Hare Psychopathy Test show a strong predictor of future violence. Moreover, Dr. Monks opined that in an unstructured environment [defendant] will return to his illegal activities. Dr. French also opined that [defendant] is a 'high risk' man unless confined in a structured environment. This evidence amply establishes that [defendant] has serious difficulty controlling his dangerous behavior." We disagree.

■ The foregoing adequately summarizes the abundant evidence that defendant's behavior was dangerous and that he did not, in fact, control it. However, the fact he *did not* control his behavior does not prove that he *was unable to do so*, thus making him "dangerous beyond [his] control." (*Howard N., supra*, 35 Cal.4th at p. 128.) There was little, if any, evidence that he *tried* to control his behavior, that he encountered *serious difficulty* when trying to do so, or that his difficulty was *caused by* his mental condition. Rather, the evidence strongly suggested that defendant *did not try* to control his dangerous behavior, because he perceived no reason to do so. Thus, he angrily denied suffering from a bipolar disorder and denied needing treatment or medication. His willingness to participate in treatment was "very limited." He angrily denied having a personality disorder: he stood up, yelled, shook his finger, and raised his voice. He denied that he abused substances, despite a number of "DUI's" on his record and a "fairly well documented" history of drug abuse. He did not accept his history of criminality, which included convictions of burglary and rape. Instead, he claimed that various agencies and criminal elements framed him and set him up. Regarding the offense that resulted in his commitment, he claimed that he was attempting suicide, he shot his wife accidentally, and the police filed a false report.

No expert opined that defendant's scores on standardized tests, his pursuit of another patient, or any other evidence demonstrates that he tried to control his dangerous behavior but encountered serious difficulty in trying to do so. Presumably, no expert was aware of the need to address that issue. To the extent that defendant *did not try* to control his dangerous behavior, the evidence did not suggest that he would "have serious difficulty controlling his dangerous behavior," *were he to try to do so*. (*Howard N., supra*, 35 Cal.4th at p. 128.) In short, the evidence was not such that *any* rational jury would have found that " '[defendant] harbored a mental disorder that made it seriously difficult for him to control his [dangerous behavior] . . . [making] the absence of a "control" instruction . . . harmless beyond a reasonable doubt.' [Citation.]" (*Id.* at p. 138, first, second, and fourth brackets added.) Defendant is entitled to a new petition and adjudication under the correct due process standard. (*Ibid.*)

We emphasize that the documentary evidence and testimony in this case predated *Howard N., supra*, 35 Cal.4th 117, and that neither the parties, nor the witnesses, nor the court had the opportunity to consider the control issue. We express no opinion as to whether sufficient evidence can or will be adduced on remand.

## DISPOSITION

The judgment is reversed, and the case remanded for further proceedings consistent with this opinion.

Morrison, J., and Butz, J., concurred.