* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V. of the Discussion.
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1158 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1159 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1160 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1161 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1162 
OPINION
On August 10, 2007, the jury found appellant Javier Castillo to be a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA) (Welf. Inst. Code, § 6600 et seq.).[1] The trial court ordered Castillo committed to the State Department of Mental Health for a two-year period.
In his timely appeal, Castillo contends the trial court erroneously and prejudicially (1) failed to specially instruct the jury that it must find Castillo's mental disorder caused him serious difficulty in controlling his dangerous behavior and (2) admitted prosecution evidence concerning the nature of the treatment programs offered to SVP's at the state mental health hospitals where Castillo had been committed. In supplemental briefing, Castillo claims his commitment was illegal because the Department of Mental Health violated the Administrative Procedure Act (APA) (Gov. Code, § 11340.5, subd. (a)) in promulgating the mental health evaluation protocol used in the evaluations relied on by the People in support of the SVP petition against Castillo. In a related claim, Castillo argues his trial counsel rendered constitutionally ineffective assistance by failing to challenge the legality of the commitment proceeding below. The People oppose those contentions and argue the court's two-year commitment order was invalid because it was made in derogation of the indeterminate commitment period mandated by Proposition 83, also known as Jessica's Law, enacted on November 7, 2006, and effective November 8, 2006 (before Castillo's jury trial and commitment). *Page 1163 
We reject Castillo's appellate contentions, but agree with the Attorney General that the two-year commitment order was unauthorized and must be corrected to conform to the unambiguous provisions of the SVPA, which mandated commitment for an indeterminate term of life.
 STATEMENT OF FACTS
It was stipulated that Castillo had suffered prior convictions for felonies that each qualified as a "sexually violent offense" for purposes of the SVPA — two counts of forcible lewd and lascivious acts upon a child less than 14 years old in December 1985 for which he received a six-year state prison term in February 1986 and one count of that same crime in June 1992 for which he received an eight-year prison term later that month.
On May 17, 2006, Danielle Smeltzer, a deputy sheriff, was assigned to the SVP unit at Twin Towers Correctional Facility in Los Angeles. She took part in a search of the cell shared by Castillo and another inmate. Among other things, she recovered several binders filled with photographs of children at play. A picture of a boy pasted to cardboard was found on the wall above or beside the headboard area of Castillo's bunk. A pornographic picture was also recovered. Numerous non-child-themed magazines had been altered by affixing child-related pictures to the inside pages. Deputy Matthew Colin assisted in the search. From a folder bearing Castillo's name and booking number, the deputy recovered a "scrapbook type of collage" made with pictures of children.
Psychologist Dawn Starr was first assigned to evaluate Castillo in 2001. She diagnosed him as having "exclusive" pedophilia, meaning that he had no age-appropriate sexual activity and was sexually attracted to both male and female children. To qualify for that diagnosis under the criteria generally accepted in the medical community, a person must be at least 16 years old and have had recurrent, intense, sexually arousing fantasies, sexual urges or behaviors involving prepubescent persons over a period of at least six months.[2]
Castillo repeatedly and consistently refused Dr. Starr's requests to be interviewed for her mental health evaluations. Nevertheless, Castillo's medical and criminal records provided an adequate basis for her evaluations. Dr. Starr relied on reports that Castillo had been convicted of felony child molestation charges in 1985 when Castillo was a volunteer coach in a parks *Page 1164 
and recreation program. In an incident with an 11 year old named Ana, he tried to force her onto his lap. When the girl refused, he grabbed her arm and fondled her buttocks and genitalia. When she tried to escape, he told her "he did this to all the little girls and he likes to screw them." Ana saw him act similarly to another girl. A nine year old named Angela reported that Castillo rubbed her buttocks and vaginal area over her pants, telling her that he had undressed "other little girls." It was Castillo's coaching assignment that gave him access to the child victims. According to the psychologist, the only likely explanation for Castillo's conduct was that he found the children sexually arousing and sexually gratifying.
Additional documentation showed that Castillo had been released on parole in July 1989, but was returned to custody in May 1991 after violating the conditions of his parole, including the stricture against being alone with children. Castillo volunteered as a football and basketball coach for children. Parents and the head coach complained that Castillo touched the children inappropriately, spent inordinate amounts of time visiting them at their homes, and collected their telephone numbers, artwork, and belongings. While in custody for the parole violation, he attended sex offender treatment for his acknowledged improper and illegal behaviors. Upon release in 1992, Castillo was referred to sex offender treatment, but did not attend.
Once again, documentation showed Castillo engaged in sexual activities involving children soon after he was paroled. Almost immediately upon his release, Castillo sought out places where children were likely to be, finding work as a handyman and ticket seller for a circus, and "engaging in various degrees of unwanted touching of children." He responded to an advertisement to help a woman clean out her house. On a pretext, he arranged to be alone with the woman's six-year-old boy. Castillo asked to touch the boy's genitals. When rebuffed, Castillo offered the boy a dollar. Despite the boy's refusals, defendant rubbed his hands and penis against the boy's unclothed buttocks. When the boy complained to his mother, Castillo physically restrained her from reporting the incident.
Dr. Starr also relied on reports that Castillo had a large number of children's letters and photographs in his possession when he was evaluated in 1998 and in 2001. She noted that on the latter date, Castillo was found with a nudist camp brochure containing photographs of naked children. In 2003, he was again found with a large amount of child-related materials. Dr. Starr detailed how the numerous child-related pictures found in Castillo's jail cell contributed to her diagnosis. Castillo must have spent "hours and hours" *Page 1165 
carefully compiling and assembling the materials so the child-related collages would be hidden within magazines that would look benign on the outside.
Applying the scientifically validated "Static-99" analysis to predict the likelihood that Castillo would commit future sex offenses, Dr. Starr found Castillo had a score of seven, which placed him in the highest risk category. According to that analysis, persons who scored a point lower had a reoffense rate of 39 percent within five years, 45 percent in 10 years, and 52 percent in 15 years. Based on the totality of her analysis, Dr. Starr had no doubt as to Castillo's current pedophilia diagnosis, including the exclusivity aspect. Given Castillo's history of reoffending soon after being released from custody, the likelihood of Castillo's committing future sex offenses against children was "serious and well-founded," even without reliance on the Static-99 results. Dr. Starr testified that the amount of child-related materials in his possession was so extraordinary — and compiled with such effort and at the high risk of being discovered and used against him in court — that it "screams volitional impairment."
Psychologist Jack Vognsen also testified for the People. He performed four mental health evaluations of Castillo — in May 2003, July 2005, July 2006, and June 2007. On each occasion, Castillo declined to be interviewed.[3] Dr. Vognsen relied on prior evaluations, hospital records, probation officer's reports, Department of Corrections and Rehabilitation records, and related documents to make his evaluations. According to Dr. Vognsen, Castillo's current diagnosis was pedophilia of the exclusive variety.
Dr. Vognsen found Castillo exhibited a high risk of committing future sexual offenses, based on application of the Static-99 analysis and the psychologist's special individualized assessment of Castillo. Consistent with Dr. Starr, Dr. Vognsen believed that the Static-99 underestimated the likelihood of reoffending. His diagnosis and opinion were supported by findings on other psychological testing instruments.[4] However, even without the Static-99 analysis or those objective instruments, Dr. Vognsen believed Castillo was "obsessed with children sexually and generally" and was an "ongoing risk for sexually violent offending." The nature of Castillo's documented sexual offenses and the escalating degree of violence involved, the fact that he had *Page 1166 
previously reoffended so quickly after being released, and the nature and amount of the child-related pictures Castillo recently displayed and possessed all contributed to his findings.
Dr. Vognsen had reviewed the evaluation prepared by Castillo's retained mental health expert, psychologist Raymond Anderson. According to Dr. Anderson's evaluation, Castillo disclosed that he had engaged in age-appropriate sexual relations. Dr. Vognsen found those representations unreliable. Not only were they inherently contradictory, but the fact that Castillo had only made them to Dr. Anderson — and only after the filing of the underlying petitions — made them suspect.
When called as a witness by the People, Castillo admitted that in 1985 he touched the genitalia of five female children nine to 11 years old, for which he had been charged with multiple felony offenses. Castillo explained that in each of those incidents of sexual molestation, it was "just a touch" and that he was not sexually aroused. Castillo acknowledged entering guilty pleas to the crime of forcible lewd and lascivious acts against two of the girls; however, he asserted that during the 1985 plea hearing, he did not understand the charges because he did not have a Spanish interpreter.[5] Nevertheless, Castillo agreed that his admission to the forcible lewd act incident involving Joshua M. in 1992 was knowingly entered.
According to Castillo, the latter incident occurred on April 5, 1992, in the boy's home. Castillo pulled the victim's pants down and rubbed his penis against the boy's buttocks. He did so because he was confused and depressed about losing his job. Despite having served a prior prison term for a child sex offense, he could not restrain himself — the depression made him "blind." Upon his subsequent release from prison, he violated his parole by engaging in prohibited contact with children. He saw children at a park who appeared sad and frustrated by their poor baseball skills. Castillo could not "resist the sadness in them. So [he] took a risk teaching them how to play baseball." Not only did he knowingly violate a probation condition by doing so, Castillo knowingly failed to comply with the condition that he attend sex offender therapy treatment. Castillo admitted that he reoffended within a year of every release from custody. At the same time, he denied having any sexual attraction to his child victims, claiming that he considered each incident "an accidental touching." As to the documents found by the sheriff's deputies, Castillo testified that the pictures had no sexual attraction for him and were compiled as mere artwork or for other benign purposes. *Page 1167 
When examined by his own counsel, Castillo testified that he was 52 years old at the time of trial. Castillo had been a professional musician from an early age. He had girlfriends as a teenager. In his late 20's, he had long-term, age-appropriate relationships with women. When the court sought clarification of the nature of those relationships, Castillo explained they were sexual "one-night stand[s]" with persons he met at the bars or cantinas where he played.
One of Castillo's sisters, Virginia Drennan, testified on his behalf. She and other family members visited him while he was in custody, both while he was incarcerated and committed to state mental hospitals. Within the past five to six years, Castillo sent Drennan's 11-year-old daughter a number of packages containing scrapbooks of newspaper clippings of animals, landscapes, puppies, and kittens. Drennan showed them to her daughter.
Dr. Anderson testified for Castillo. In the course of making his evaluations, the psychologist interviewed Castillo twice — in 2002 and 2007 — for approximately two and a half hours each time. Dr. Anderson's assistant administered a variety of psychological tests to Castillo. Some had scales for diagnosing sexual disorders, others tested for personality disorders, intelligence, and organic brain disorders. The results of the MMPI administered in 2002 and 2007 showed none of the characteristics expected for a sexually disordered sexual offender. Castillo tested in the normal range on other personality inventories. On the other hand, the administration of a sex inventory in 2002 showed Castillo's responses approached those indicative of pedophilia.
Dr. Anderson found some of his clinical findings suggested a pedophilia diagnosis, but most did not. He concluded the test results as a whole supported a presumption against a definitive diagnosis of pedophilia. Regarding the question of Castillo's future dangerousness, Dr. Anderson testified that psychologists are "not very good at predicting the behavior of individuals." The objective measures used to predict such offenses are methodologically and statistically flawed as predictors of what a particular person will do. Using federal Department of Justice data, Dr. Anderson placed Castillo's base rate for being convicted of a future offense at 7 percent, which he discounted by another three percentage points because of Castillo's age and the trend toward declining rates of reoffending with age. Dr. Anderson explained what he believed were important weaknesses in the Static-99 as a testing instrument for predicting future dangerousness.
On cross-examination, Dr. Anderson testified that Castillo "still wants to associate with children," which the expert deemed unwise. Additionally, Dr. Anderson had stated in his 2007 evaluation, "Any offender with the history one sees in the present case is presumed to pose at least some risk of future uncontrolled sexual behavior." *Page 1168 
 DISCUSSION
I. Instructional Error Claim
At the parties' request, the trial court instructed the jury with a modified version of CALJIC No. 4.19, which defines a "sexually violent predator" as a person who "(1) has been convicted of a sexually violent offense against two or more victims,[6] . . . (2) has a diagnosed mental disorder, [and] (3) the disorder makes him or her a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent predatory criminal behavior." That definition mirrored the statutory requirements.[7] The pattern instruction further defined the term "likely" in a manner consistent with California Supreme Court precedent: "The word `likely' as used in this definition means the person presents a substantial danger, that is, a serious and well-founded risk that he or she will commit sexually violent predatory crimes if free in the community."[8] In addition, the instruction cautioned that the jury "may not find [Castillo] to be a sexually violent predator based on prior offenses without relevant evidence of a currently diagnosed mental disorder that makes him a danger to the health and safety of others in that it is likely that he will engage in sexually violent predatory criminal behavior."
The trial court refused to give the special instructions proffered by Castillo whereby the jury would have to find Castillo suffered from a "volitional impairment that makes him dangerous beyond his control" or otherwise had a mental disorder that caused "serious difficulty in controlling his behavior." As authority for the special instructions, Castillo relied on Kansas v. Crane (2002) 534 U.S. 407 [151 L.Ed.2d 856,122 S.Ct. 867] (Crane) and In re Howard N. (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (Howard N.). Castillo candidly acknowledges that in People v. Williams (2003) 31 Cal.4th 757, 774-776 [3 Cal.Rptr.3d 684, 74 P.3d 779] (Williams), the California *Page 1169 
Supreme Court held that instructions analogous to those given at his trial comported with due process requirements under Crane. Nevertheless, he argues that Howard N. casts doubt on Williams's precedential viability and effectively requires additional "volitional impairment" instructions along the lines he requested at trial.
In Crane, the United States Supreme Court held that compliance with the federal Constitution's substantive limitations on the civil commitment of dangerous sexual offenders required "proof of serious difficulty in controlling behavior . . . sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." (Crane, supra, 534 U.S. 407, 413.) In Williams, our Supreme Court "interpreted Crane as confirming the principle . . . that `a constitutional civil commitment scheme must link future dangerousness to a mental abnormality that impairs behavioral control, while . . . making clear that the impairment need only be serious, not absolute.'" (In re Lemanuel C. (2007) 41 Cal.4th 33, 42 [58 Cal.Rptr.3d 597, 158 P.3d 148], quoting Williams, supra,31 Cal.4th at p. 773.) The Williams court "concluded that `a commitment rendered under the plain language of the [SVPA] necessarily encompasses a determination of serious difficulty in controlling one's criminal sexual violence' [citation], as required by Crane, because `the SVPA requires a diagnosed mental disorder affecting the person's emotional or volitionalcapacity that predisposes the person to commit sex crimes in a menacing degree.'" (In re Lemanuel C., supra, at p. 42, quoting Williams, supra, at p. 776.)
As Williams explained, special instructions such as those advocated by Castillo are not only unnecessary from the constitutional perspective, but would tend to trench upon the Legislature's proper role. "[A] judicially imposed requirement of special instructions augmenting the clear language of the SVPA would contravene the premise of both [Kansasv. Hendricks (1997)] 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072], andKansas v. Crane, supra, 534 U.S. 407, that, in this nuanced area, theLegislature is the primary arbiter of how the necessary mental-disorder component of its civil commitment scheme shall be defined and described. (See Kansas v. Crane, supra, at pp. 410, 413; Hendricks, supra, at p. 359.) No reason appears to interfere with that legislative prerogative here. [¶] Accordingly, we conclude, Kansas v. Crane, supra, 534 U.S. 407, does not compel us to hold that further lack-of-control instructions or findings are necessary to support a commitment under the SVPA. For the reasons we have detailed, we decline to do so." (Williams, supra,31 Cal.4th at pp. 774-775, fn. omitted.) *Page 1170 
We agree with the Attorney General that nothing in Howard N. abrogates the Williams holding or otherwise casts doubt on its rationale. HowardN. considered the former extended detention scheme for juvenile offenders (§ 1800 et seq.), which required a "finding that the person is `physically dangerous to the public' because of a `mental . . . deficiency, disorder, or abnormality,'" but did not "expressly require a demonstration that the person has serious difficulty controlling his dangerous behavior. . . ." (Howard N., supra, 35 Cal.4th at p. 132.) To preserve the statute's constitutionality, Howard N. construed the scheme "to include a requirement of serious difficulty in controlling dangerous behavior." (Id. at p. 133.) That is, the Howard N. court merely imputed to the juvenile detention scheme the same requirement of a nexus between mental disability and likelihood of future criminal behavior that theWilliam's court had previously found implicit in the SVPA. (SeeWilliams, supra, 31 Cal.4th at p. 774 ["California's [SVP] statute inherently embraces and conveys the need for a dangerous mental condition characterized by impairment of behavioral control."].)
Our determination that Howard N. left Williams's holding intact is bolstered by the fact that Howard N. discussed Williams extensively and positively without any implication that it intended to abrogate the prior decision. Further, in In re Lemanuel C., supra, 41 Cal.4th at page 38, our Supreme Court upheld the current juvenile extended detention scheme against constitutional challenges, concluding: "A further finding that an inability to control behavior results in `a serious and well-founded risk of reoffense' is not required to preserve the scheme's constitutionality." It follows that our Supreme Court's decision inWilliams controls. (Auto Equity Sales, Inc. v. Superior Court (1962)57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)
II. Evidentiary Claim
Over Castillo's objection, the trial court admitted testimony concerning the nature of the treatment programs offered to SVP's at the state mental health hospitals where Castillo had been committed. Castillo agrees that testimony concerning his refusal to participate in treatment programs was relevant to the issue of whether he was likely to commit sexual offenses upon release. However, he contends that once his nonparticipation was established, the details of such programs had no substantial relevance to the issue of his future dangerousness. Detailed descriptions of the foregone treatment plans, Castillo argues, prejudiced him by diverting the jury's attention from the issue of his current ability to control his behavior to the irrelevant question of whether he should have participated in the treatment programs. *Page 1171 
Castillo's argument would have much greater force if he had refused all participation in such programs. As the trial court understood in making its ruling, however, Castillo opted out after attending the first of the five prescribed treatment phases. Admission of the challenged testimony therefore permitted the jury to make an intelligent assessment of Castillo's reasons for declining treatment — an assessment that bore directly on the legitimate issue of Castillo's amenability to treatment.
Outside the jury's presence, Castillo objected to anticipated testimony from the prosecution about the components of the state hospital's five-phase treatment program as being irrelevant and more prejudicial than probative under Evidence Code section 352. The prosecution argued evidence of the nature of the treatment program was relevant because Castillo only participated in the first phase, and his failure to complete the other phases bolstered the psychologists' opinions that Castillo had not received the treatment needed to control his behavior upon release. The trial court overruled the objection, agreeing that Castillo's failure to complete aspects of the treatment program was relevant to showing potential future dangerousness. For instance, the jury could reasonably infer that Castillo chose not to go forward with treatment because he did not want to make the effort — which, in turn, would show he did not appreciate the seriousness of his mental condition and that he could not be expected to take the steps required to control his deviant behavior if released. The trial court could reasonably conclude that the strength of such an inference would depend on the nature of the treatment Castillo declined.
We review relevancy and Evidence Code section 352 rulings for abuse of discretion. (People v. Weaver (2001) 26 Cal.4th 876, 933 [111 Cal.Rptr.2d 2, 29 P.3d 103]; People v. Siripongs (1988) 45 Cal.3d 548,574 [247 Cal.Rptr. 729, 754 P.2d 1306].) "A trial court abuses its discretion when its ruling `fall[s] "outside the bounds of reason."' [Citation.]" (People v. Waidla (2000) 22 Cal.4th 690, 714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) "`Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "No evidence is admissible except relevant evidence." (Id., § 350.) "[T]he trial court `has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence' [citation]." (People v. Weaver, supra,26 Cal.4th at p. 933.)
"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) *Page 1172 
There was no abuse of discretion here. Dr. Starr testified as to the five-phase treatment program for sex offenders at Atascadero State Hospital and Coalinga State Hospital, where Castillo had been in custody. The first phase consisted of informing the patient about the treatment plan. In the second, the patient discusses his or her sexual offenses and writes an autobiography, analyzing the conduct underlying each conviction, including the offender's mental state during each incident. The therapist corrects the patient's misperceptions and helps the patient develop alternative behaviors. In the third phase, the patient attempts to apply the recommended alternative strategies and behaviors, and is expected to keep an honest journal of his or her thoughts and experiences. In phase four, the patient works with therapists to plan a transition to the community. Polygraph examinations would be administered to the patients at that stage. The final stage is the patient's supervised release into the community. In the 11 years Castillo spent in those state hospitals, he refused to take part in any treatment program beyond phase one. Dr. Starr opined that Castillo would benefit from meaningful participation in those programs.
Castillo admitted that by choice he had never participated in any phase other than the first of the five-phase treatment program at the state hospitals. Nevertheless, Castillo asserted he would never molest another child because he never wanted any child "to go through such a horrifying experience." Castillo explained he had renounced his prior behaviors after studying the experiences of victims of sexual crimes. When the prosecutor began to ask Castillo about the nature of the foregone treatment programs, the defense objected. Outside the jury's presence, defense counsel explained that in keeping with a prior trial court ruling, the prosecution should not ask any question that would implicate phase five (release into the community) because it would bring up the proscribed area of Castillo's immigration status. The court ruled that questioning Castillo's attitudes to future treatment was improper as irrelevant; however, the prosecution could inquire about Castillo's reasons for not availing himself of treatment in the past.
As the Attorney General points out, "Evidence of the person's amenability to voluntary treatment . . . is relevant to the ultimate determination whether the person is likely to engage in sexually violent predatory crimes if released from custody." (People v. Roberge, supra,29 Cal.4th at p. 988, fn. 2.) "[I]t would be reasonable to consider the person's refusal to cooperate in any phase of treatment provided by the Department, particularly a period of supervised outpatient treatment in the community, as a sign that the person is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community." (People v. Superior Court (Ghilotti), supra,27 Cal.4th at p. 929 (Ghilotti).) Those principles extend to and justify the trial court's ruling. Here, Castillo's reasons for not *Page 1173 
proceeding with treatment were highly probative as to his amenability to voluntary treatment, since he refused to participate once he was informed what he would be expected to do in that program. As the trial court recognized, the jury could not properly assess those reasons absent some knowledge of what the treatment plan entailed.
Moreover, there was nothing prejudicial in the legal sense in informing the jury that Castillo opted out of the program when informed that he would be expected to honestly assess and acknowledge the wrongfulness of his past misconduct and to develop and apply strategies for correcting his improper sexual impulses. Finally, we note that the challenged testimony was not particularly lengthy and there is no substantial likelihood the jury would have considered it for an improper purpose — certainly, nothing in the jury instructions or the attorneys' arguments suggested a reason for doing so.
III. "Underground Regulation" Claim Under the APA
Castillo contends his commitment was illegal because it derived from the Department of Mental Health's reliance on a mental health evaluation protocol that was subsequently invalidated by the Office of Administrative Law as being an "underground regulation." That is, the evaluations used to support the People's case at the probable cause hearing were based on a set of mandatory guidelines that the Office of Administrative Law deemed a "regulation," which could not be used by a state agency until formally adopted after compliance with procedural requirements required under the APA. We reject the claim on procedural grounds because it was not preserved for appellate review and on the merits because the protocol's status as an underground regulation does not undermine the legitimacy of Castillo's commitment.
A. The Statutory Scheme and Protocol
The commitment of an SVP requires compliance with an elaborate network of administrative and judicial procedures. Initially, prison officials screen the inmate's records to determine whether he or she is likely to be an SVP. If so, the inmate is referred to the Department of Mental Health for a full evaluation as to whether he or she meets the SVP criteria under section 6600. (§ 6601, subd. (b).) Two mental health professionals designated by the department "shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require *Page 1174 
assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (Id., subd. (c).) If the evaluators agree the person meets those criteria, the director of the department must forward a request for a commitment petition to the county where the offender was convicted. (Id., subd. (d).)
Judicial proceedings begin if the county's legal counsel concurs with the director's recommendation and the district attorney or county counsel files a commitment petition in the superior court. (§ 6601, subd. (i).) "Once the petition is filed, a superior court judge must `review the petition and determine whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that [the defendant] is likely to engage in sexually violent predatory criminal behavior upon his or her release.' (§ 6601.5.) If the judge makes that determination from this facial review, the judge orders the defendant detained in a secure facility pending a probable cause hearing under section 6602." (People v. Hayes (2006) 137 Cal.App.4th 34, 42-43 [39 Cal.Rptr.3d 747] (Hayes).) "If the trial court determines there is probable cause, the SVP petition proceeds to trial. (Cooley[v. SuperiorCourt (2002) 29 Cal.4th 228,] 245 [127 Cal.Rptr.2d 177, 57 P.3d 654].) Either party may demand a jury trial. The defendant has the right to the assistance of counsel, to retain experts, and to access to relevant psychological and medical reports. He can only be found to be an SVP by a standard of beyond a reasonable doubt, and any jury verdict must be unanimous." (Hayes, supra, 137 Cal.App.4th at p. 44; see §§ 6603, subds. (a), (b), (e), (f), 6604.) If the person was found to be an SVP prior to November 8, 2006, he or she was committed for two years to the department's custody for appropriate treatment and confinement. (Former § 6604; Stats. 2000, ch. 420, § 3.) Effective November 8, 2006, the SVPA was amended by Proposition 83, changing the commitment from a two-year renewable term to an indefinite term of commitment.[9] (§ 6604; Stats. 2006, ch. 337, § 55; Prop. 83, § 27, approved Nov. 7, 2006, eff. Nov. 8, 2006.)
Castillo's probable cause hearing took place on December 20, 2005. The superior court found probable cause to believe Castillo satisfied the SVP criteria, based on evaluation reports by Drs. Vognsen and Starr. Castillo, who had waived his right to appear at the hearing, was represented by counsel. The court ordered that Castillo remain in custody and set the matter for a *Page 1175 
pretrial hearing. There is no indication Castillo raised the issue of the protocol's compliance with the APA.
Government Code section 11340.5, subdivision (a) provides: "No state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in [Government Code section] 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter." On August 15, 2008, the Office of Administrative Law issued a determination that the protocol used by the Department of Mental Health for SVP evaluations — the Clinical Evaluator Handbook and Standardized Assessment Protocol (2007) — met the statutory definition of a regulation and, therefore, should have been adopted pursuant to the APA. As such, it was an "underground regulation" as defined in California Code of Regulations, title 1, section 250.[10]
The determination made it clear, however, that the ruling was concerned solely with whether the protocol satisfied the criteria for a regulation under Government Code section 11342.600. It made no assessment as to the protocol's "advisability" or "wisdom." Rather, the determination cautioned that the Office of Administrative Law "has neither the legal authority nor the technical expertise to evaluate the underlying policy issues involved in the subject of this determination."
B. Analysis
We first assess the question of forfeiture. It is undisputed that prior to this appeal Castillo never challenged any aspect of the commitment procedures on the ground that the Department of Mental Health's protocol, as used by Drs. Starr and Vognsen, was an "underground regulation" under the APA. A challenge of this sort is most appropriately directed to the trial court. (See Ghilotti, supra, 27 Cal.4th at pp. 912-913 [challenges to an SVP petition based on noncompliance with the statutory requirement as to concurrence of evaluators' opinions should be raised in trial court pleadings]; In re Wright (2005) 128 Cal.App.4th 663, 672 [27 Cal.Rptr.3d 281] [question whether an evaluator had proper degree was an "evidentiary issue is properly left to the trial court"]; People v.Superior Court (Preciado) (2001) 87 Cal.App.4th 1122, 1130 [105 Cal.Rptr.2d 159] (Preciado) ["When the required evaluations have not been performed, an alleged SVP may bring that fact to the trial court's attention and obtain appropriate relief."].) Because there appears to be no *Page 1176 
reason why a timely challenge could not have been made below, the general rule of forfeiture applies. (Cf. People v. Partida (2005) 37 Cal.4th 428,431 [35 Cal.Rptr.3d 644, 122 P.3d 765].)
As the Attorney General points out, the long-established forfeiture rule as to claimed defects in a criminal information is analogous and serves the same important ends: The requirement that a defendant file a demurrer "permits correction of pleading defects prior to trial, thereby promoting efficiency and conserving judicial resources" and "it prevents `[a] defendant from speculating on the result of the trial and raising the objection after an unfavorable verdict.'" (People v. Jennings (1991)53 Cal.3d 334, 357 [279 Cal.Rptr. 780, 807 P.2d 1009].) By raising this claim for the first time on appeal, Castillo invites just that sort of speculation and misallocation of judicial resources. Among other things, we note that the Office of Administrative Law's determination on which Castillo relies concerns the 2007 version of the protocol, while the trial court's probable cause ruling was based on evaluations conducted in 2003 and 2005. His failure to make this claim in a timely fashion deprives this court of the necessary factual basis for reviewing it — nothing in the record shows whether the protocol version on which Drs. Starr and Vognsen relied contained the same provisions found to render it a "regulation" for purposes of the APA.
Castillo does not present any contrary authority or argument, but rather seeks to avoid the procedural bar by arguing the alleged error was one of fundamental jurisdiction and that trial counsel's failure to object below amounted to constitutionally ineffective assistance of counsel. We therefore turn to the merits of his claim.
As our summary of the procedural requirements for an SVP commitment makes clear, the Department of Mental Health's protocol is statutorily mandated for use in the administrative actions leading up to the filing of an SVP petition.[11] (§ 6601, subds. (c), (d).) "`[T]he requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so.' [Citation.] `After the petition is filed, rather than demonstrating the existence of the two evaluations, the People are required to show the more essential fact that the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior. [Citation.]' [Citation.]" (People v. Scott (2002) 100 Cal.App.4th 1060,1063 [123 Cal.Rptr.2d 253]; see In re Wright, supra,128 Cal.App.4th at p. 672.) *Page 1177 
"[O]nce the petition is filed a new round of proceedings is triggered. (Hubbart [v. Superior Court (1999) 19 Cal.4th 1138,] 1146 [ 81 Cal.Rptr.2d 492, 969 P.2d 584].) After the petition is filed, rather than demonstrating the existence of the two evaluations, the People are required to show the more essential fact that the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior." (Preciado, supra, 87 Cal.App.4th at p. 1130; see In re Wright, supra,128 Cal.App.4th at p. 672.) At the probable cause hearing, the court's focus on the evaluations shifts from one of assessing formal conformance with procedural requirements to evaluating their probative value on the substantive SVP criteria. "[T]he probable cause hearing is `a full, adversarial preliminary hearing. . . .' [Citation.] The defendant has the right to the assistance of counsel. (§ 6602, subd. (a).) The hearing `allow [s] the admission of both oral and written evidence' on the issue of probable cause. [Citations.] Despite their hearsay nature, the reports of the mental health professionals may be admitted — but the defendant may challenge the reports by calling the professionals to the stand and cross-examining them." (Hayes, supra, 137 Cal.App.4th at p. 43.)
The probable cause hearing under the SVPA is analogous to a preliminary hearing in a criminal case as both are designed to protect the accused from having to face trial on groundless or otherwise unsupported charges. "The probable cause hearing, therefore, is only a preliminary determination that cannot form the basis of a civil commitment; the ultimate determination of whether an individual can be committed as an SVP is made only at trial. . . . Like a criminal preliminary hearing, the only purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the SVPA petition." (Cooley v. Superior Court,supra, 29 Cal.4th at p. 247, citation omitted; see Hayes, supra,137 Cal.App.4th at p. 43.)
We therefore disagree with Castillo's central contention that the use of the protocol-based mental health evaluations at the preliminary phases of the commitment proceedings deprived the trial court of fundamental jurisdiction to order commitment following the jury trial. "In general, the only act that may deprive a court of jurisdiction is the People's failure to file a petition for recommitment before the expiration of the prior commitment." (People v. Whaley (2008) 160 Cal.App.4th 779, 804
[73 Cal.Rptr.3d 133] (Whaley), citing People v. Evans (2005)132 Cal.App.4th 950, 956 [34 Cal.Rptr.3d 35] and Litmon v. SuperiorCourt (2004) 123 Cal.App.4th 1156, 1171 [21 Cal.Rptr.3d 21].) Moreover, even in cases involving the denial of fundamental rights in the analogous preliminary hearing stage of a criminal prosecution, it is well established that reviewing courts apply the harmless error standard set forth in People v. Pompa-Ortiz (1980) 27 Cal.3d 519, 529-530 [165 Cal.Rptr. 851, 612 P.2d 941] (Pompa-Ortiz). (Hayes, supra, *Page 1178 137 Cal.App.4th at pp. 49-51.) "Pompa-Ortiz applies to SVP proceedings." (Hayes, supra, at p. 51, citing People v. Hurtado (2002)28 Cal.4th 1179, 1190 [124 Cal.Rptr.2d 186, 52 P.3d 116], People v.Talhelm (2000) 85 Cal.App.4th 400, 405 [102 Cal.Rptr.2d 150] andPeople v. Butler (1998) 68 Cal.App.4th 421, 435 [80 Cal.Rptr.2d 357].)
Under the Pompa-Ortiz standard, "`irregularities in the preliminary examination procedures which are not jurisdictional in the fundamentalsense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if [the] defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination. The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities. At that time, by application for extraordinary writ, the matter can be expeditiously returned to the magistrate for proceedings free of the charged defects.'" (Hayes, supra, 137 Cal.App.4th at p. 50, quoting Pompa-Ortiz, supra, 27 Cal.3d at p. 529.) "The rule ofPompa-Ortiz applies to denial of substantial rights as well as to technical irregularities," including claims of the denial of counsel and ineffective assistance of counsel at a preliminary hearing. (Hayes,supra, at pp. 50-51.)
Castillo cites no authority for his assertion that such use of an "underground regulation" as the basis for filing the SVP petition rendered his commitment proceedings void ab initio and therefore subject to per se reversal due to lack of fundamental jurisdiction. There are few rights more fundamental than a defendant's right to counsel at critical phases of trial such as a felony preliminary hearing. Yet, even denial of that right is subject to harmless error review. (Coleman v. Alabama
(1970) 399 U.S. 1, 10-11 [26 L.Ed.2d 387, 90 S.Ct. 1999]; People v.Johnson (1970) 13 Cal.App.3d 1, 4-5 [91 Cal.Rptr. 203].)
Here, the 2008 Office of Administrative Law determination did not suggest the Department of Mental Health's protocol was deficient or unreliable as an instrument for assessing a person's status as a potential SVP. Castillo's speculation that APA compliance will result in a materially different protocol that might be to his advantage hardly serves to undermine the legitimacy of his commitment following a unanimous jury verdict. That is, apart from asserting the protocol's status as an "underground regulation," Castillo fails to explain how use of the protocol in the proceedings against him resulted in actual prejudice, either by depriving him of a fundamental right or a fair trial. He does not challenge the sufficiency of evidence at the probable cause hearing or at trial — and the protocol played no role in his trial. *Page 1179 
As there was no prejudice under Pompa-Ortiz, Castillo's ineffectiveness of counsel claim must fail. (Strickland v. Washington (1984) 466 U.S. 668,687-698 [80 L.Ed.2d 674, 104 S.Ct. 2052] [defendant must demonstrate prejudice in order to establish ineffective assistance of counsel].) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (Id.
at p. 697; see In re Fields (1990) 51 Cal.3d 1063, 1079 [275 Cal.Rptr. 384, 800 P.2d 862].)
IV. Unauthorized Commitment Order
We agree with the Attorney General's contention that the trial court's imposition of a two-year commitment on Castillo was unauthorized because the law in effect at the time of trial required commitment for an indeterminate term.
Before discussing the merits of this contention, we address a threshold question of justiciability — whether this matter is moot, given that the latest two-year term under the trial court's commitment has expired. The underlying order involved three consolidated petitions seeking separate two-year recommitments — cases Nos. ZM004837, ZM006562, and ZM009280. The commitment order was issued on August 10, 2007, with the third two-year commitment period running from October 5, 2005, to October 5, 2007. That period expired prior to the filing of the opening brief in this appeal. However, on the date of his recommitment on the consolidated petitions, Castillo was arraigned on a new SVP petition, case No. ZM011971. He denied the new allegations, but the trial court found probable cause to proceed "based on the trial that was just completed and the evidence that was taken in that trial as well as the documents filed by the [district attorney] in this petition." There is no indication in the record that a new commitment has been imposed in case No. ZM011971 which might render this appeal moot. To the contrary, this record establishes only that Castillo's current commitment is a function of the underlying commitment order, and the issue of that order's validity is not moot.
Proposition 83 was approved by voters on November 7, 2006, and took effect the following day. Among other things, the proposition changed the commitment term for a person found to be an SVP from two years to an indeterminate term. (People v. Shields, supra,155 Cal.App.4th at pp. 562-563.) As modified, section 6604 admits of no discretion as to the appropriate commitment term. (§ 6604 ["If the court or jury determines that *Page 1180 
the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health."].) An indeterminate term is the only term authorized by the SVPA, effective November 8, 2006.
Castillo's jury rendered its verdict on August 10, 2007, nine months after Proposition 83's effective date. The trial court made its two-year commitment order on the same day that it received the verdict. Section 6604.1, subdivision (a), also effective November 8, 2006, provides: "The indeterminate term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section."[12] Nevertheless, on July 30, 2007, a stipulation was filed as to Castillo's consolidated petitions concerning the implementation of Jessica's Law. Its terms were contained in an attached stipulation by representatives of the district attorney, public defender, and superior court dated October 11, 2006. As pertinent to this appeal, the stipulation provided that in light of the "uncertainty in the retroactive application" of the change from a two-year to an indeterminate commitment term, the district attorney's office would seek two-year commitments for all SVP petitions filed before the new legislation's effective date "for cases in which the trial and commitment occur after the effective date of the legislation."[13] The trial court ordered a two-year commitment, consistent with the stipulation.
Castillo argues we have no jurisdiction to consider the legality of the commitment order because the People failed to preserve the issue for appeal by filing a timely cross-appeal. Alternatively, Castillo contends principles of estoppel preclude the Attorney General from taking a position on appeal contrary to that advanced by the district attorney in the trial court stipulation.[14] As we explain, Castillo's timely appeal provided us with jurisdiction *Page 1181 
over this case, including the question of whether the trial court had authority to issue a commitment order on terms other than those authorized by the Legislature. Further, estoppel does not apply when enforcement of the stipulation would be contrary to the Legislature's plain directive, would entail a serious risk to public safety, and where the party seeking estoppel did not detrimentally rely on the position advanced by the public entity below.
Citing UAP-Columbus JV 326132 v. Nesbitt (1991) 234 Cal.App.3d 1028,1034 [285 Cal.Rptr. 856], Castillo argues we have no jurisdiction to reach the propriety of the trial court's two-year commitment order because the People did not file a cross-appeal. That decision, however, merely expressed the general rule that there can be no appellate jurisdiction over a "`case or controversy'" in the absence of a timely appeal. (Ibid.) Here, Castillo's timely appeal of the commitment order provided this court with subject matter jurisdiction over the legitimacy of the trial court's commitment order.
As to the question of waiver or forfeiture based on the failure to object below, we note that were this a matter of criminal sentencing, there would be no serious question. The forfeiture doctrine — whereby only claims properly raised and preserved by the parties are reviewable on appeal — applies to claims of error asserted by both the People and the defendant as to discretionary sentencing choices. (People v. Smith
(2001) 24 Cal.4th 849, 852 [102 Cal.Rptr.2d 731, 14 P.3d 942]; Peoplev. Tillman (2000) 22 Cal.4th 300, 303 [92 Cal.Rptr.2d 741, 992 P.2d 1109];People v. Scott (1994) 9 Cal.4th 331, 353-354 [36 Cal.Rptr.2d 627,885 P.2d 1040] [claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices raised for the first time on appeal are not subject to review].) However, our Supreme Court has "created a narrow exception to the waiver rule for `"unauthorized sentences" or sentences entered in "excess of jurisdiction."' [Citation.] Because these sentences `could not lawfully be imposed under any circumstance in the particular case' [citation], they are reviewable `regardless of whether an objection or argument was raised in the trial and/or reviewing court.' [Citation.] We deemed appellate intervention appropriate in these cases because the errors presented `pure questions of law' [citation], and were `"clear and correctable" independent of any factual issues presented by the record at sentencing.' [Citation.] In other words, obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings are not waivable." (Peoplev. Smith, supra, 24 Cal.4th 849, 852; see People v. Shabtay (2006)138 Cal.App.4th 1184, 1192 [42 Cal.Rptr.3d 227].) *Page 1182 
Here, the trial court had no power to order Castillo committed except as conferred by the SVPA, modified by Proposition 83. In light of the jury's verdict, an indeterminate term was the sole remedy available, and the legislative scheme authorizing commitment afforded the court no discretion in formulating alternative commitment terms or to delay the effective date of the modifications effected by Proposition 83. (§ 6604.) Imposition of an indeterminate term would not have amounted to an impermissible retroactive application of a penal statute. "Because a proceeding to extend commitment under the SVPA focuses on the person's current mental state, applying the indeterminate term of commitment of Proposition 83 does not attach new legal consequences to conduct that was completed before the effective date of the law. [Citation.] Applying Proposition 83 to pending petitions to extend commitment under the SVPA to make any future extended commitment for an indeterminate term is not a retroactive application." (Bourquez v. Superior Court, supra,156 Cal.App.4th at p. 1289 (Bourquez); see Whaley, supra,160 Cal.App.4th at pp. 794-797.)
Castillo argues the unauthorized sentence exception to the forfeiture doctrine applies only to criminal sentencing. He is correct that SVP proceedings "are civil in nature and are designed `to provide "treatment" to mentally disordered individuals who cannot control sexually violent criminal behavior.'" (People v. Carlin (2007) 150 Cal.App.4th 322, 332
[58 Cal.Rptr.3d 495] (Carlin).) However, it does not follow that reviewing courts must give effect to legally unauthorized commitment orders. We find People v. Renfro (2004) 125 Cal.App.4th 223 [22 Cal.Rptr.3d 680] (Renfro), a decision by our colleagues in Division Six of this court, to be highly instructive. There, defendant Renfro had entered into a plea agreement that conditioned his guilty plea to an assault-related offense on the prosecutor's promise that the offense could not be used as a qualifying offense for a future mentally disordered offender (MDO) commitment. Nevertheless, MDO proceedings were subsequently initiated against Renfro. Following his bench trial, the trial court refused to enforce the agreement and committed him as an MDO. (Renfro, supra, 125 Cal.App.4th at pp. 227-228.)
In affirming the judgment against the claim that due process required compliance with the plea agreement, the Renfro court was cognizant that "an MDO proceeding is civil in nature, not criminal" and that "`[t]he purpose of the MDO statutory scheme is to provide mental health treatment
for those offenders who are suffering from presently severe mentalillness, not to punish them for their past offenses.'" (Renfro, supra,125 Cal.App.4th at pp. 231-232, quoting People v. Superior Court(Myers) (1996) 50 Cal.App.4th 826, 837 [58 Cal.Rptr.2d 32].) TheRenfro court nevertheless refused to enforce a plea agreement that would effectively "nullify a mandatory statutory parole scheme." (Renfro, at p. 230.) "[N]either the prosecution nor the *Page 1183 
sentencing court has authority to impose a prison sentence without parole or to alter the applicable period of parole established by the Legislature and imposed by the Board of Prison Terms." (Id. at p. 232; see also id. at p. 233 ["the MDO provision of Renfro's plea agreement went beyond the sentencing court's authority"].)
In the same way, we reject the notion that the civil nature of Castillo's SVPA proceedings serves to insulate an unauthorized commitment order from appellate review. The rationale for the unauthorized sentence exception to the general forfeiture rule applies with equal force to Castillo's commitment order. As in People v. Talibdeen (2002)27 Cal.4th 1151 [119 Cal.Rptr.2d 922, 46 P.3d 388], this was an instance in which "at the time of sentencing, the trial court had no choice and had to impose state and county penalties in a statutorily determined amount on defendant. The erroneous omission of these penalties therefore `present[ed] a pure question of law with only one answer. . . .' [Citation.] Accordingly, we follow our lower courts and hold that the Court of Appeal properly corrected the trial court's omission of state and county penalties even though the People raised the issue for the first time on appeal." (Id. at p. 1157 [appellate court properly corrected trial court's omission of state and county penalties under Pen. Code, § 1464, subd. (a), and Gov. Code, § 76000, subd. (a), despite the People's raising the issue for the first time on appeal]; see alsoPeople v. Chambers (1998) 65 Cal.App.4th 819, 823 [76 Cal.Rptr.2d 732] [failure to object to imposition of two separate restitution fines is not a waiver]; In re Paul R. (1996) 42 Cal.App.4th 1582, 1590 [50 Cal.Rptr.2d 421] [failure to object to denial of offset for direct victim restitution is not a waiver]; People v. Sexton (1995)33 Cal.App.4th 64, 69 [39 Cal.Rptr.2d 242] [failure to object to order for payment of restitution to victim's insurer is not a waiver], disapproved on a separate ground in People v. Birkett (1999)21 Cal.4th 226, 247, fn. 20 [87 Cal.Rptr.2d 205, 980 P.2d 912].)
Finally, notwithstanding the unauthorized sentence exception, we have discretion to consider points not raised at trial "when a contention newly made on appeal presents a question of law based upon undisputed facts [citation]." (E.g., Raphael v. Bloomfield (2003)113 Cal.App.4th 617, 621 [6 Cal.Rptr.3d 583]; Bialo v. WesternMutual Ins. Co. (2002) 95 Cal.App.4th 68, 73 [115 Cal.Rptr.2d 3].) The determination of whether Castillo's two-year commitment was authorized requires no factual determinations.
Having found the trial court's two-year commitment unauthorized, we turn to Castillo's argument that the Attorney General should be estopped from taking a contrary position to that of the district attorney at trial. Generally speaking, the equitable estoppel doctrine applies where one party *Page 1184 
unfairly induces another to do what he or she would not otherwise have done, resulting in an injury. (Hair v. State of California (1991)2 Cal.App.4th 321, 328-329 [2 Cal.Rptr.2d 871]; see People v.Quartermain (1997) 16 Cal.4th 600, 618 [66 Cal.Rptr.2d 609, 941 P.2d 788] [recognizing the general principle that "when a prosecutor makes a promise that induces a defendant to waive a constitutional protection and act to his or her detriment in reliance on that promise, the promise must be enforced"].) Castillo fails to show any detrimental reliance on the stipulation to seek only a two-year commitment. We find unconvincing Castillo's assertion that his incentive to defend himself was diminished by the understanding that, due to numerous trial continuances, he was effectively facing only a two-month commitment at the time of trial. Under applicable law, Castillo would have known that a verdict in his favor would mandate his release "at the conclusion of the term for which he . . . was initially sentenced, or that [he] be unconditionally released at the end of parole, whichever is applicable." (§ 6604.) Castillo had no reason to think a verdict in the People's favor would mean he would be free after only two more months of commitment — after all, the commitment terms on two of the three petitions on which he was being tried had already expired.
Moreover, as explained in Renfro, even in cases — unlike Castillo's — where the prosecution has broken its promise, specific performance is neither a favored remedy nor required by the federal Constitution. It would be especially inappropriate when the "plea agreement went beyond the sentencing court's authority" such that it would undermine the applicable legislative scheme "and, in so doing, undermine public policy, public safety and the administration of justice by our courts." (Renfro,supra, 125 Cal.App.4th at p. 233.) Proposition 83's amendment of the commitment term made "it easier to keep one adjudicated an SVP committed and in custody. This change is in keeping with the general intent of Proposition 83 `to strengthen and improve the laws that punish and control sexual offenders.' (Voter Information Guide, Gen. Elec.[(Nov. 7, 2006)] text of Prop. 83, p. 138.)" (Bourquez, supra,156 Cal.App.4th at p. 1287.) Here, the evidence supporting the jury's verdict was overwhelming as to every element of its SVP determination, including Castillo's future dangerousness.
V. Constitutional Challenges to Commitment Term*
In supplemental briefing, Castillo argues imposition of the legislatively mandated indeterminate commitment term will violate his federal constitutional rights to due process and equal protection, along with the prohibitions against ex post facto laws and double jeopardy.[15]
As we explain, the SVPA as modified to require an indeterminate commitment term complies with federal Supreme Court precedent
Initially, Castillo contends indeterminate commitment offends due process guarantees, which he asserts proscribe continued commitment for any period in excess of two years unless the state is required to periodically prove by clear and convincing evidence that the SVP remains mentally ill and dangerous. Well established decisional law dictates no such requirement. In Addington v. Texas (1979) 441 U.S. 418 (Addington), the high court "held that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his own welfare and protection of others." (Foucha v. Louisiana 504 U.S. 71, 75-76 (Foucha) [such persons may be held as long as they are both mentally ill and dangerous, but no longer]; Kansas v. Hendricks (1997) 521 U.S. 346, 357 (Hendricks) ["We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. [Citation.] It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty."].) Here, Castillo was afforded the full panoply of constitutional trial rights, and a unanimous jury applied a constitutionally valid standard to find beyond a reasonable doubt that he was an SVP
Contrary to Castillo's central contention, there is no recognized due process right to periodic adjudications where the state must prove the committed person remains mentally ill and a danger to society. Indeed, the Supreme Court has upheld indeterminate commitment terms against due process challenges in Jones v. United States (1983) 463 U.S. 354, 370
["when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society"], and Addington, supra, 441 U.S. at pp. 431-432 [due process requires a clear and convincing evidence standard of proof in involuntary civil commitment proceedings].) In short, federal due process rights do not proscribe indefinite involuntary commitment where, as with the SVPA, the legislative scheme provides adequate opportunities to determine the committed person's current mental health condition to ensure the right to be released when he or she no longer requires commitment. (See Foucha,supra, 504 U.S. at p. 77; People v. Allen (2007) 42 Cal.4th 91, 103-104.)
As modified, the SVPA mandates annual mental health evaluations as to "whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community," which must be filed with the committing court. (§ 6605, subd. (a).) If the Department of Mental Health determines the person is no longer an SVP, or that conditional release is appropriate, the person is authorized to petition the court for release. A finding of probable cause by the court conveys the right to a hearing in which the committed person is entitled to the benefit of all constitutional protections that were afforded at the initial commitment proceeding, and the "burden of proof at the hearing shall be on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (Id., subd. (d).) If the trier of fact finds in favor of the committed person, he or she must be unconditionally released and discharged. (Id., subd. (e).)
Where the Department of Mental Health does not authorize a petition, the committed person may still file an unauthorized petition for conditional or unconditional release with the court. In that situation, the court may summarily deny the petition if it is frivolous or fails to allege sufficient facts to warrant a full hearing on it. (§ 6608, subd (a).) Otherwise, the committed person has the burden of proof to show that he or she is no longer an SVP based on a preponderance of evidence (Id., subd. (i).) When adjudicating an unauthorized petition, if the trial court finds that the committed person would not be a danger to others due to a diagnosed mental disorder if under supervision and treatment in the community, the court will order a one-year conditional release to an outpatient treatment program. After one year, the trial court conducts a second hearing to determine if the committed person's unconditional release is warranted. (Id., subd. (d).) If the trial court denies an unauthorized petition, the committed person may not file a new petition for one year. (Id., subd. (h).)
The SVPA therefore provides sufficient procedural safeguards to protect Castillo's legitimate liberty interests, subject to our state's compelling interest in protecting its citizens from sexually violent predators. (See Hendricks, supra, 521 U.S. at p. 363; Addington, supra,441 U.S. at p. 426). Regular examination of an involuntarily committed person's mental status by independent medical personnel has been held adequate to protect the individual from being wrongfully detained (Parhamv. J.R. (1979) 442 U.S. 584, 607-612; United States v LaFromboise (8 th Cir. 1988) 836 F.2d 1149, 1152 [statutory requirement that hospital director act independently in the assessment of insanity acquittees is sufficient to satisfy due process]; Hickey v. Morris (9 th Cir. 1983)722 F.2d 543, 548-549 [due process does not require automatic periodic adversary hearings when the acquittee is provided with regular examinations by free and independent health professionals].)
We turn to Castillo's equal protection argument, in which he contends SVP's are "similarly situated" to mentally disordered offenders (MDO's), persons found not guilty by reason of insanity, and persons committed under the Lanterman-Petris-Short Act (LPSA) (§§ 5000 et seq.). He asserts the SVPA offends equal protection guarantees because the others are subject to commitment terms of two years or shorter, while only SVP's are subject to an indeterminate commitment term. (See Pen. Code, §§ 2970, 2972, subd. (c), 1026.5, subd. (b)(8).)
Equal protection of the law mandates "that persons similarly situated with respect to the purpose of the law must be similarly treated under the law. [Citations.] If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.] The question is not whether persons are similarly situated for all purposes, but `whether they are similarly situated for purposes of the law challenged.'" (People v. Buffington (1999) 74 Cal.App.4th 1149, 1155
(Buffington).) It follows that "[t]he state `may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of power.'" (People v. Hubbart (2001) 88 Cal.App.4th 1202,1217.) "Strict scrutiny is the correct standard of review in California for disparate involuntary civil commitment schemes because liberty is a fundamental interest." (Buffington, supra, at p. 1156.)
Castillo's claim fails at the threshold. The SVPA "narrowly targets `a small but extremely dangerous group of [SVP's]. . . .'" (Cooley, supra,29 Cal.4th at p. 253.) The other classifications Castillo mentions encompass a broad range of conduct and mental illness. For instance, persons who are involuntarily committed under the LPSA include those who have not committed any crime. (§ 5300.5, subd. (b).) Moreover, unlike the other classifications, an SVP is defined as a person who has committed specific types of crimes and has a mental disorder "that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) An explained ante, by virtue of the SVP's mental illness, the person "presents a substantial danger, that is, a serious and well-foundedrisk, that he or she will commit such crimes if free in the community." (Ghilotti, supra, 27 Cal.4th at p. 922.) Commitment under the SVPA uniquely requires a finding that the individual committed a predatory
sexually violent offense. (People v. Hurtado (2002) 28 Cal.4th 1179, 1182,1186-1187.) "Because predatory offenders could strike at any time and victimize anyone, they pose a much greater threat to the public at large." (Id. at p. 1187.) Finally, the prognosis for SVP's distinguishes it from the other classifications. The findings and declarations for Proposition 83, which amended the SVPA, specifically recognized that "sex offenders are the least likely to be cured." (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, p. 127.)
The ex post facto and double jeopardy challenges fare no better. InHubbart v. Superior Court, supra, 19 Cal.4 th at pages 1174-1179, our Supreme Court rejected analogous claims under the ex post facto and double jeopardy clauses of the state and federal Constitutions, finding that the statutory scheme was not punitive in nature. (See also Carlin,supra, 150 Cal.App.4th at p. 348.) The modifications under Proposition 83 do not affect that conclusion. The findings and declarations for Proposition 83 show the voters' intent was to align California with the majority of other states that provided for an indeterminate commitment and to avoid "unnecessary and frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, p. 127.) The intent behind the amendments was therefore to reduce unnecessary administrative and fiscal burdens, rather than to impose additional punishment. Moreover, the overarching purposed of the SVPA remains civil in nature, as it is "`linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others.'" (Hubbart v. Superior Court, supra,19 Cal.4th at p. 1176, quoting Hendricks, supra, 521 U.S. at p. 363.) *Page 1185 
 DISPOSITION
Castillo's commitment order is modified to reflect the indeterminate term mandated by the SVPA as modified by Proposition 83. The judgment is affirmed in all other respects.
Turner, P. J., and Mosk, J., concurred.
[1] All further statutory references are to the Welfare and Institutions Code unless noted otherwise.
[2] Dr. Starr was aware that Castillo had reported to other mental health professionals that he had had sexual relations with adults, but she explained why those reports lacked credibility.
[3] When called by the People, Castillo testified that he met with Dr. Vognsen on September 25, 2006. At that time, Castillo had to terminate the interview because the psychologist appeared to take offense with him and became so angry they could not communicate with each other. Also, Castillo said, the psychologist smelled of alcohol. According to Dr. Vognsen's recollection and records, there was no such meeting.
[4] As Dr. Starr had also testified, Dr. Vognsen could not take advantage of other psychological testing instruments such as the Minnesota Multiphasic Personality Inventory (MMPI) because Castillo refused to be interviewed.
[5] Language interpreters assisted Castillo during the underlying trial.
[6] Castillo's jury was instructed with the pre-Jessica's Law version of the pattern instruction based on the law in effect at the time the underlying petitions were filed. Effective November 8, 2006, section 6600, subdivision (a) provides that there need only be a sexually violent offense against one or more victims. Here, the predicate offense element was established by stipulation and is not at issue in this appeal.
[7] Section 6600, subdivision (a) defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (See People v. Fulcher
(2006) 136 Cal.App.4th 41, 52 [38 Cal.Rptr.3d 702].)
[8] A person is "`likely'" to engage in sexually violent predatory behavior when "`the person presents a substantial danger, that is, aserious and well-founded risk, that he or she will commit such crimes if free in the community.'" (People v. Roberge (2003) 29 Cal.4th 979, 986 [129 Cal.Rptr.2d 861, 62 P.3d 97], quoting People v. Superior Court(Ghilotti) (2002) 27 Cal.4th 888, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949].)
[9] See People v. Shields (2007) 155 Cal.App.4th 559, 562-563 [65 Cal.Rptr.3d 922] ("The change in section 6604 from a two-year term to an indeterminate term was accomplished by the Legislature's amendment of the statute effective September 20, 2006, and again by the California voters' approval of Proposition 83 . . . effective November 8, 2006. [Citations.]").
[10] The determination can be accessed via the Office of Administrative Law Web site:http://www.oal.ca.gov/determinations2008.htm (as of Jan. 30, 2009);/http://www.oal.ca.gov/determinations2008.htm
[11] For purposes of this analysis, we assume without finding that the protocol actually used by Drs. Starr and Vognsen was susceptible to the same findings as those in the Office of Administrative Law's 2008 determination concerning the 2007 version of the protocol.
[12] As the Sixth District recently explained, the reference to an "initial" commitment order in section 6604.1, subdivision (a), in the context of the Proposition 83 modifications to the SVPA does not mean the first time a person was found to be an SVP, but rather applies to any post-November 8, 2006 commitment order following a determination of SVP status under section 6604. (See People v. Whaley, supra,160 Cal.App.4th at pp. 798-799.) As to a person who is already committed under the SVPA, a subsequent proceeding to impose a two-year commitment under the old law or an indeterminate commitment term under the new law amounts to a "`new and independent proceeding at which the petitioner must prove the person meets the criteria of an SVP.'" (160 Cal.App.4th at p. 796, quoting Bourquez v. Superior Court (2007)156 Cal.App.4th 1275, 1289 [68 Cal.Rptr.3d 142].)
[13] The language of Proposition 83 did not contain an express statement of retroactivity.
[14] In his reply brief, Castillo addressed the Attorney General's arguments in favor of imposing an indeterminate term. In a separate pleading, Castillo seeks to strike the portion of respondent's brief that raises the unauthorized commitment order claim or, alternatively, in the event we reverse the two-year commitment order as being unauthorized, Castillo seeks leave to file a supplemental brief challenging the constitutionality of the SVPA's indeterminate sentencing scheme. At oral argument, we granted the parties the opportunity to file supplementary briefing as Castillo requested. His motion is otherwise denied for the reasons set forth in our opinion.
* See footnote, ante, page 1156.
[15] As defendant recognizes, decisions that have rejected these arguments are subject of review by our Supreme Court. (E.g., People vGarcia (2008) 165 Cal.App.4th 1120, review granted Oct. 16, 2008, S166682; People v. Boyle (2008) 164 Cal.App.4th 1266, review granted Oct. 1, 2008, S166167; People v. Johnson (2008) 162 Cal.App.4th 1263, review granted Aug. 13, 2008, S164388; People v. McKee (2008)160 Cal.App.4th 1517, review granted Jul. 9, 2008, S162823.) *Page 1186