Filed 4/28/26  P. v. Wagner CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROGER WAGNER,<br><br>Defendant and Appellant. | B346113<br><br>(Los Angeles County<br>Super. Ct. Nos. M0255196, A624927) |


APPEAL from an order of the Superior Court of Los Angeles County, Maria Cavalluzzi, Judge.  Affirmed.

Margaret Manning, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Roger Wagner appeals from the trial court's order extending his involuntary commitment under Penal Code section 1026.5, subdivision (b).[1] He does not contest the court's statutorily required findings that he has a mental illness that causes him to pose a substantial danger of physical harm to others. Instead, he contends only that substantial evidence does not support the additional, constitutionally required finding that he has serious difficulty controlling his potentially dangerous behavior. We disagree and affirm.

## PROCEDURAL HISTORY

In April 1983, appellant was found not guilty by reason of insanity (NGI) of assault with intent to commit rape (§ 220, subd. (a)(1)). The trial court ordered him committed to the Department of State Hospitals. Appellant was admitted to Patton State Hospital on July 18, 1983, for a term not to exceed six years. The trial court subsequently extended his commitment numerous times under section 1026.5.

On September 20, 2024, the People filed the instant petition to extend appellant's commitment pursuant to section 1026.5. Appellant personally waived his right to trial by jury; his counsel joined. The petition was tried to the court, which granted the petition, extending appellant's commitment through January 10, 2027. Appellant timely appealed.

---

[1]     Undesignated section references are to the Penal Code.

# FACTUAL BACKGROUND

## I.   People's Evidence

### A.   Commitment Offense

In January 1983, appellant grabbed a woman on the street and started "grinding on her" in an effort to have sexual intercourse. After the woman pulled away, appellant ran after her, grabbed her a second time, and pulled on either her clothing or skin to see her vagina. The woman managed to escape.

### B.   Testimony of Treating Psychiatrist

Appellant's current treating psychiatrist, Dr. Steven Matthew Toffel, M.D., had known appellant for about nine months. Dr. Toffel met with appellant monthly. Dr. Toffel also met with appellant and his entire treatment team quarterly and annually. He testified that appellant was an "active participant" in the team meetings, but appellant "usually cut short" the monthly conversations because he "typically doesn't want to discuss a lot of psychiatric-related matters."

Dr. Toffel diagnosed appellant with schizoaffective disorder, bipolar type. He testified that appellant also had "borderline social functioning"[2] and cannabis use disorder that was in remission due to the controlled environment at Patton. Appellant's active symptoms primarily "relate[d] to chronic delusions, often religious in nature," including that he was God or "the Holy Jesus." Appellant told Dr. Toffel and the rest of his treatment team that the Bible said he did not have any mental

---

[2]   The written report filed with the petition and received into evidence by the court states that appellant's diagnoses included "borderline intellectual functioning," not "borderline social functioning."

3

illness; he also denied ever having psychiatric symptoms. He nevertheless complied with his psychotropic medication regimen, telling the treatment team he wanted to follow their instructions.

Appellant spent a lot of time in his room and tended to keep to himself. Patton staff did not document any "inappropriate behaviors," including violence or aggression, during the preceding six months.

### C.    Testimony of Evaluating Psychologist

Dr. Mario Souza, Psy.D., testified that he was trained in clinical and forensic psychology. His job at Patton was to evaluate patients and prepare reports for the court. Souza had been appellant's evaluator since 2020. For the most recent evaluation, Dr. Souza reviewed appellant's current medical records, spoke to members of appellant's treatment team, and met with appellant. He prepared a written report that the trial court received into evidence and read and considered in connection with the proceedings.

Dr. Souza testified that appellant had actively participated in his meeting with Dr. Souza and was "very respectful." However, appellant exhibited "delusional thinking, lack of insight, and some thought disorganization." Specifically, he told Dr. Souza he was "the Jesus Christ" and talked about being invincible at a high school football game. Appellant "blanketly denied" suffering from any mental illness or symptoms thereof. Dr. Souza testified that such lack of insight into one's mental illness, formally known as "anosognosia," is "a typical presentation" in schizoaffective disorders. When Dr. Souza asked appellant about his commitment offense, appellant acknowledged that he had tried to have sexual intercourse with the victim but characterized the incident as "a misunderstanding" and

4

attempted to "show that the situation wasn't as bad as people portrayed it to be."

Dr. Souza testified that a "fundamental" goal of treatment at Patton is for patients to develop insight into their mental illnesses, violence risk, and "the behavioral chain associated with their sexual offending." He explained that "if you don't recognize what you suffer from, there's no way you can stop it from impacting your behaviors." Appellant's delusional religious behaviors were present at the time of his commitment offense, had persisted, and "he has no insight into the presence of these beliefs." Dr. Souza opined that this was "severely problematic and adds to his recidivism risk."

Dr. Souza had spoken with appellant about sex offender treatment available at Patton "in every single one of my interviews with him since 2020." Each time, appellant told Dr. Souza he would not attend sex offender treatment because he was not a sex offender. Dr. Souza opined that appellant's refusal to attend the treatment "shows a lack of cooperation with treatment providers who are asking him to engage in a specific form of treatment," and "there's no way he's going to gain an understanding of why he engaged in this problematic sexual behavior, without first acknowledging it, and then receiving the expert training and knowledge . . . to make sure this behavior doesn't happen again." Dr. Souza later added that "better insight into his severe mental illness and to everything else that follows" would help appellant "recogniz[e] triggers of a warning sign" and "know how to manage [him]self."

Dr. Souza opined that, due to his schizoaffective disorder, appellant had serious difficulty controlling his dangerous behavior and posed a substantial danger of physical harm to

5

others.  He based these opinions on "risk factors that have been shown in the scientific literature that contributes to violence recidivism."  Specifically, Dr. Souza testified that he "put a lot of weight on dynamic factors," which are emphasized in the "gold standard" HCR-20 violence risk assessment tool.  In appellant's case, dynamic factors included appellant's "severe lack of insight into his violence risk" and "sexually problematic behaviors," as well as his lack of insight into his need for treatment and medication.  Appellant also showed "low responsivity to treatment" despite his relatively high attendance rates at certain groups, and a "lack of understanding of how some of these beliefs about women and sexual consent can increase his risk for dangerous behavior."  Dr. Souza opined that "any female he does interact with romantically would also be potentially at risk," particularly since appellant had an "unrealistic appraisal of how well he will do in the community" and lacked a "workable relapse prevention plan."

## II.    Appellant's Evidence

Appellant did not present any expert testimony.  Instead, appellant testified as the only defense witness.

Appellant testified that he was ready to leave Patton.  He had been "locked up" for many years, despite not doing "anything negative, like penetrate the woman and rape her thoroughly." Instead, he "had a misunderstanding with a young lady on the street" when he was 22 years old, and "came here to get out early."  When he was released, appellant planned to rent an apartment, "have a good life, do the right thing, take my medications, [and] try to look for a wife."  He added that he already had a girlfriend named Tracy; he "wrote her a beautiful

6

love letter" before his 1983 arrest, and believed she was waiting for him due to his "connection with her spirits."

Appellant testified that he would continue to take his medications. Even though he was "not mentally ill," he felt that the medication was "slowing me down to keep me in commission to making me stable in my mind," and giving him "some kind of structure." While he was in Patton, he was "just asking for drugs for a favor," which staff gave him "because I'm a Virgo." Appellant also testified, however, that the staff had "been treating me so bad in this hospital," including writing "nasty things in my chart, like I masturbate in their face." Appellant conceded he "did some things like that" in the past, but he was currently "really feeling that I'm in step with the Lord."

On cross-examination, appellant clarified that he did not say sex offender treatment was not applicable to him. Rather, he "just said it's a bunch of nonsense. It's a bunch of craziness, and I don't need that garbage in my mind." He added that he knew "enough about sex to be restored . . . without all of that trash they're saying, oh, this and that, don't do this, don't have sex. I don't want to hear all that." Appellant later reiterated his belief that "going to those groups is not going to help me."

When asked about his commitment offense, appellant testified that it was a misunderstanding. He explained that he encountered the victim while he was on his way to his mother's house and started to "rap to her." He then asked her some questions, after which point he "grabbed her and started grinding her." The victim broke away and yelled that appellant was trying to rape her, "[s]o I ran after her." The victim went into a tire shop where three men were present, and appellant "grabbed her" again, and "pulled back her pants and saw her vagina." The

7

woman "broke loose" and "jumped into this car." Appellant ran away, "and when I got there we were smoking marijuana."

## III. Ruling

The trial court stated that it had "listened very carefully to all of the testimony" and "found Dr. Souza to be not only credible," but also his "opinions to be very, very valid" and well explained. The court further found that appellant, while "very sincere and respectful to the court," demonstrated a "reluctance" to participate in sex offender treatment, which "kind of indicates the lack of insight." The court also found appellant lacked insight into his commitment offense by "failing to see what it probably was for the woman, which was a very frightening and traumatic experience for her," and failed to appreciate why or how "his behavior was prompted by his own . . . mental illness."

The court found that appellant continued to have a mental disease, schizoaffective disorder, and "based on that mental disease" and "the very well-articulated opinion of Dr. Souza," that "there remains a risk of recidivism, and he is a substantial danger." The court accordingly sustained the petition. It encouraged appellant to fully participate in sex offender treatment to perhaps become eligible for Patton's conditional release program (CONREP) during the next review period.

## DISCUSSION

Appellant contends the People presented insufficient evidence to support a finding that he has serious difficulty controlling his potentially dangerous behavior. (See *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159-1165 (*Zapisek*).)

8

## I. Legal Principles

A person committed to a state hospital after being found not guilty of a felony by reason of insanity "may not be kept in actual custody longer than the maximum term of commitment." (§ 1026.5, subd. (a)(1).) However, the term of commitment may be extended for two years if, after a trial in accordance with rights guaranteed in criminal proceedings, the trier of fact finds that the person, "by reason of mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1), (7), (8).) Proof of dangerousness also requires proof that the person has "at the very least, serious difficulty controlling his potentially dangerous behavior." (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) This latter requirement, while not in the text of section 1026.5, is necessary to comport with constitutional principles of due process. (See *In re Howard N.* (2005) 35 Cal.4th 117, 136; *Zapisek*, *supra*, 147 Cal.App.4th at pp. 1159-1165.) To satisfy it, the "People are not required to prove the defendant "'is *completely* unable to control his behavior.'" [Citation.] Instead, the defendant's 'impairment need only be serious, not absolute.'" (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370 (*Kendrid*).)

Whether a person has serious difficulty controlling his or her potentially dangerous behavior is a question of fact generally resolved with the assistance of expert testimony. (See *People v. Redus* (2020) 54 Cal.App.5th 998, 1011 (*Redus*).) We employ the substantial evidence standard of review, viewing the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have made the finding beyond a reasonable doubt. (See *Zapisek*, *supra*, 147 Cal.App.4th at p. 1165; *Redus*, *supra*, 54 Cal.App.5th at p. 1011;

*People v. Cheatham* (2022) 82 Cal.App.5th 782, 789 (*Cheatham*).) "A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878 (*Bowers*); accord, *Zapisek*, *supra*, 147 Cal.App.4th at p. 1165; *Redus*, *supra*, 54 Cal.5th at p. 1011.) However, expert medical opinion must be based upon relevant, probative facts; it does not constitute substantial evidence if it is based upon a guess, surmise, or conjecture. (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504.) Witness credibility and the truth or falsity of historical facts are matters within the exclusive province of the factfinder; we do not revisit them. (*Ibid.*)

## II. Analysis

### A. Substantial Evidence Supports the Finding

Dr. Souza, a psychology expert whom the trial court expressly found credible, personally evaluated appellant and opined that he had "severe difficulty controlling his dangerous behavior" due to his mental illness. Dr. Souza further testified that this opinion was based on "supported risk factors … in the scientific literature that contributes [*sic*] to violence recidivism," including dynamic factors assessed in the HCR-20 risk assessment tool. He opined that appellant's "severe lack of insight" into his mental illness and violence risk, "lack of insight into his need for treatment and medication," "low responsivity to treatment," and lack of a "workable relapse prevention plan" increased his risk for dangerous behavior and placed women he may "interact with romantically" at particular risk.

This uncontroverted testimony, bolstered by appellant's in many respects, is grounded in relevant and probative facts and

10

based on scientific literature, not conjecture or guesswork.  "[A]n NGI defendant's lack of insight and continued delusions of the kind he or she suffered from at the time of the commitment offense can support a finding of continued dangerousness." (*Redus*, *supra*, 54 Cal.App.5th at p. 1012.)  Indeed, courts have recognized that there may be considerable overlap between an NGI defendant's lack of understanding and his or her ability to control behavior.  (See *Kendrid*, *supra*, 205 Cal.App.4th at p. 1370, quoting *Kansas v. Crane* (2002) 534 U.S. 407, 415).)

Dr. Souza also testified that appellant's treatment team prescribed sex offender treatment for appellant.  He further testified that he discussed sex offender treatment with appellant at every one of their meetings over a period of years, but appellant denied he was a sex offender and refused to attend the treatment.  A "person's amenability to voluntary treatment is a factor in determining whether commitment is necessary." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 928.)  Thus, a "defendant's refusal to undergo treatment constitutes potent evidence that he is not prepared to control his untreated dangerousness by voluntary means." (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 354.)[3]

---

[3] Although appellant correctly observes that *Ghilotti* and *Sumahit* addressed the commitment of sexually violent predators, the Supreme Court recognized in *Ghilotti* that this principle applies in "similar schemes for the civil commitment of mentally disordered and dangerous persons." (*Ghilotti*, *supra*, 27 Cal.4th at p. 928*,* citing *People v. Bolden* (1990) 217 Cal.App.3d 1591, 1600 and *People v. Williams* (1988) 198 Cal.App.3d 1476, 1482-1483.)

A rational trier of fact could, and in this case did, properly conclude that appellant continued to experience serious difficulty controlling his potentially dangerous behavior.

### B.      Appellant's Authorities Are Distinguishable

Appellant's authorities are distinguishable.  In *Cheatham*, *supra*, 82 Cal.App.5th at p. 786, the defendant acknowledged his mental illness, recognized the importance of his medications, and took proactive steps to address his substance abuse disorder.  Here, in contrast, appellant denied having a mental illness, maintained that his commitment offense had been a mere misunderstanding, refused to participate in sex offender treatment, and stated that he only took medication to placate his treatment team.

In *Redus*, *supra*, 54 Cal.App.5th at pp. 1001-1002, the defendant acknowledged his mental illness and was a "'fragile old man'" who "'you could probably push . . . over with one finger,'" such that he was physically incapable of acting violently.  (*Id.* at p. 1011.)  In *People v. Jenkins* (2023) 95 Cal.App.5th 142, the defendant was likewise physically impaired; she used a wheelchair.  (See *id.* at pp. 147, 153.)  Although appellant points out that he is now 65 years old, there was no specific testimony about appellant's physical state, and Dr. Souza opined that "any female he does interact with romantically would also be potentially at risk," suggesting he was more physically capable than Redus or Jenkins.

Finally, in both *Redus* and *People v. Johnson* (2020) 55 Cal.App.5th 96, the defendants did not engage in any violent or aggressive behavior during their lengthy commitments or their CONREP releases.  Johnson was not violent or aggressive even after discontinuing his medication for two months (*Johnson*,

*supra*, 55 Cal.App.5th at p. 109), and Redus recognized and sought assistance for homicidal ideation he experienced while on CONREP (*Redus, supra*, 54 Cal.App.5th at p. 1012.)  That evidence undermined the expert opinions.  Here, there is no evidence that undermines the expert opinions regarding appellant's serious difficulty controlling his potentially dangerous behavior.  (See *People v. Sumahit*, *supra*, 128 Cal.App.4th at p. 353 ["The fact that defendant has not misbehaved in a strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others."].)

### C.    Double Jeopardy

In light of our conclusion that sufficient evidence supported the order extending appellant's commitment, we need not address appellant's contentions regarding the double jeopardy implications of a reversal.

## DISPOSITION

The order sustaining the petition is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COGLIATI, J.[*]

We concur:

ZUKIN, P. J.                                        MORI, J.

---

[*] Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.